UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X
AARON KATZEL,                                          :
                                                       :
              Plaintiff,                  :
                                                       :
                                                       :   **COMPLAINT AND JURY DEMAND**
    -against-                                  :
                                                       :   Case No. _____
                                                       :
AMERICAN INTERNATIONAL GROUP,                          :
INC., PETER SOLMSSEN, LUCY FATO                        :
                                                       :
          Defendants.                   :
                                                       :
------------------------------------------------------- X

       COMES NOW Plaintiff Aaron Katzel ("Plaintiff" or "Mr. Katzel"), by his attorneys, The

Law Offices of Neal Brickman, P.C., and as and for his Complaint against Defendants, American

International Group, Inc. ("AIG" or "Defendant"), Peter Solmssen ("Solmssen"), and Lucy Fato

("Fato") (collectively, "Defendants") respectfully states and alleges as follows:

## NATURE AND SUMMARY OF THE ACTION

       1.     This action alleges retaliation in violation of the Sarbanes-Oxley Act of 2002

("Sarbanes" or "Sox") (as amended by the Dodd-Frank Wall Street Reform and Consumer

Protection Act ("Dodd-Frank" or "DFA"), Pub.L.111-203 § 929A (2010)) and the whistleblower

protection provision of Dodd-Frank, 18 U.S.C. § 1514; § 78U-6(h)(1)(A)(i)-(iii)(collectively the

"Acts").  In retaliation for his reporting actual and perceived violations of federal law relating to

fraud against shareholders and investors – and dishonest, unethical and fraudulent corporate

conduct as well as inadequate internal controls that would fail to prevent, or otherwise allow,

activity that might ultimately lead to shareholder fraud or harm – to AIG's Compliance

Department, Katzel's employment with AIG was unlawfully terminated.  On October 27, 2017

Plaintiff filed a Complaint under the Acts with the Occupational Safety and Health

Administration ("OSHA").  A copy of that Complaint was forwarded to the Securities and Exchange Commission ("SEC").  In retaliation for his filing the Complaint with OSHA, AIG illegally eliminated more than $1 million of Katzel's performance-related equity awards.  Plaintiff seeks to recover from Defendants compensatory and exemplary damages, statutory penalties, liquidated damages, and attorneys' fees, as a result of these unlawful retaliatory actions.

2.      Plaintiff worked for Defendant AIG for more than ten years, during which time he was promoted four times, ultimately serving as the Head of AIG's Legal Operations Center ("LOC").

3.      As set forth more fully below, Plaintiff brings this Complaint because Defendants terminated his employment and eliminated more than $1 million of his accrued performance equity awards in retaliation for raising his concerns about AIG's corporate fraud, malfeasance, and numerous internal control weaknesses, all in direct contravention of the Acts' protections.

4.      Defendants illegally retaliated against Plaintiff for exercising his legally protected rights and obligations to inform his supervisors about, and his refusal to participate in, conduct that he reasonably believed: (a) violated laws and rules designed to protect against fraudulent practices in connection with the sale of securities, (b) violated laws, rules, orders, standards, or prohibitions subject to the jurisdiction of, or enforceable by the Securities and Exchange Commission ("SEC"), and (c) violations of the Sarbanes-Oxley Act of 2002 ("Sarbanes" or "SOX") (as amended by the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank" of "DFA"), Pub. L. 111–203 § 929A (2010)).

5.      In 2015, AIG launched a process to "carve out" its Legal Operations Center ("LOC") from AIG and turn it into an externally facing, independent business supported by outside investors that would provide services to, and generate equity value for, AIG.  This carve

out process was called Project Kalahari and the carve out business was called The Legal Operations Company LLC ("TLOC").

6. This ambitious, and potentially lucrative, initiative was ultimately undermined by dishonesty and fraud committed by, and with the support of, senior executives of Defendant AIG.

7. In particular, employees working for Defendant AIG intentionally shared confidential information regarding the LOC with a direct competitor in a Request for Proposal ("RFP") process in which AIG's TLOC was a bidder, violating AIG's own compliance policies and destroying AIG's potential for success in a tangible business opportunity.

8. AIG employees also affirmatively misled AIG's executive leadership about the prospects of the Kalahari project by colluding in creating, and then shredding evidence of, affirmatively misleading information regarding the LOC's performance.

9. In an attempt to preserve the value of the opportunity and to ensure an objective deliberation regarding that opportunity, Plaintiff raised concerns about the integrity of the Project Kalahari evaluation process throughout the Fall of 2016. In response, members of AIG's senior management responsible for managing the carveout internally acknowledged in writing that Plaintiff's concerns regarding the integrity of the process had merit.

10. In October 2016, AIG's executive leadership terminated TLOC's participation in the pending RFP process, as well as the broader Project Kalahari carveout, based, in large part, on the intentionally misleading analysis prepared by AIG's employees and the subjective uninformed biases of certain members of AIG's executive leadership.

11. AIG's (newly installed) then-General Counsel, Peter Solmssen ("Solmssen") participated in the decision to terminate TLOC's participation in the RFP and the Project Kalahari carveout.

12.     The termination of that RFP and the Kalahari project resulted in the intentional destruction of an opportunity for AIG and its shareholders to generate significant equity value at a time when AIG was operating at a loss.

13.     Concerned about the use of intentionally misleading information to destroy a valuable opportunity and its harmful outcome for AIG, outside investors and AIG's shareholders, in January 2017, Plaintiff formally raised his concerns to AIG's compliance team in response to an annual anti-fraud questionnaire circulated as part of AIG's SOX processes.

14.     In response to the concerns formally raised by Plaintiff by means of the SOX questionnaire, AIG purported to begin an investigation into the matter.

15.     Although Defendant AIG assured Plaintiff that his complaint was well-founded, its investigation failed to address or even to examine the violations of AIG's compliance policies and failures of AIG's internal controls that Plaintiff identified.

16.      Instead, AIG's Compliance department, overseen by Solmssen, prepared only a superficial draft report that (a) did not address at all certain of the significant concerns raised by Plaintiff; (b) failed to effectively investigate or address the concerns that it purported to focus on; and (c) ultimately contained only limited recommendations which were themselves never even implemented.

17.     Shortly after Plaintiff's formal complaint, however, Mr. Solmssen terminated Plaintiff, notwithstanding Solmssen's delivery, only two months earlier, of a positive performance evaluation regarding Plaintiff's work and his granting Plaintiff his full annual performance bonus.

18.     This termination was demonstrably retaliatory, and was followed by a malicious and retaliatory campaign to harm Plaintiff's professional reputation.

19.     Moreover, after Plaintiff filed his Complaint with OSHA – and after that Complaint was forwarded to the SEC – AIG and its newly appointed General Counsel Lucy Fato further retaliated against Katzel by unlawfully terminating all of his performance-related equity. While no notice or explanation was given at the time, this termination was allegedly made as a result of Katzel's refusal to sign a release that would require him to waive the claims in his pending OSHA complaint and affirmatively misrepresent that AIG's conduct was lawful and in compliance with its internal protocols.

20.     In addition, Defendants AIG and Fato destroyed and/or oversaw the destruction of all records relating to Plaintiff's more than $1 million in accrued performance equity and AIG's elimination thereof, while the OSHA complaint was pending, and in violation of AIG's records management policies and applicable federal rules governing the preservation of evidence during a pending litigation.

21.     Plaintiff seeks all appropriate relief stemming from Defendants' unlawful retaliatory termination, retaliatory elimination of his equity awards, and actions to harm his professional reputation.

## **APPLICABLE LAW**

22.     Plaintiff submits this Complaint pursuant to 18 U.S.C. § 1514A(a), which states:

No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)) including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c)), or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee —

(1) To provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes

constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by —

(A) a Federal regulatory or law enforcement agency;

(B) any Member of Congress or any committee of Congress; or

(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

(2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

## JURISDICTION AND VENUE

23.     Plaintiff brings this action to recover damages caused by the Defendants' violations of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A and the whistleblower protections of Dodd-Frank.

24.     Jurisdiction of this Court over Plaintiff's claims is invoked pursuant to 18 U.S.C. § 1514A(b)(1)(B), 12 U.S.C. § 5567(c)(4)(D), and 28 U.S.C. § 1331 and the doctrine of pendent jurisdiction.

25.     Venue is proper within this district, pursuant to 28 U.S.C. § 1391(b)(2), in that "a substantial part of the events or omissions giving rise to the claim occurred" in New York, New York.

26.     Plaintiff has satisfied all administrative requirements necessary to bring this action in district court.

27.     To wit, on or about October 27, 2017, Plaintiff timely filed a complaint with the United States Department of Labor's ("DOL") Occupational Safety and Health Administration

6

("OSHA") setting forth arguments and data to establish that Defendants violated several laws, including SOX.

28.     On or about December 21, 2018, Plaintiff filed an appearance with the Office of Administrative Law Judges ("OALJ") requesting a *de novo* hearing pursuant to 29 C.F.R. § 1980.106, and the matter was assigned to Administrative Law Judge Lauren C. Boucher.

29.     On February 27, 2020, pursuant to 18 U.S.C. § 1514A(b)(1)(B) and 29 C.F.R. 1980.114(b), Plaintiff filed a Notice of Intent to File a Complaint in the United States District Court ("Notice of Intent") with OALJ, Administrative Law Judge Lauren C. Boucher, and served copies of same on Defendant AIG.

30.     Because more than one hundred and eighty (180) days passed since Plaintiff filed his complaint with OSHA, and given that the Secretary has not issued a final decision in that time, Plaintiff is entitled to seek *de novo* review in federal district court.

31.     Accordingly, Plaintiff has exhausted all requisite administrative remedies and will file a copy of the file-stamped complaint with the OALJ within seven (7) days after the date of this filing.

### THE PARTIES

32.     Plaintiff Aaron Katzel is a graduate of Columbia University and the University of Pennsylvania School of Law.  Katzel is an attorney licensed to practice law in New York State.

33.     After approximately ten (10) years of private practice with two prestigious multi-national law firms, Plaintiff Katzel joined AIG.

34.     Plaintiff was employed by AIG from December 2006 to May 2017.  He was initially hired as an Associate General Counsel.

35.     During his tenure at AIG, Plaintiff was promoted several times and consistently received raises and incentive compensation in the form of deferred performance-related equity

awards.  By 2016 Katzel was receiving an annual compensation package of nearly, or, in certain circumstances, more than, $1 million for his work.

36.     Plaintiff Katzel's last role at AIG was Head of the LOC, a position he held for more than 4 years prior to his termination.  He currently resides in the State of California.

37.     Defendant AIG is a Delaware Corporation that is publicly traded on the New York Stock Exchange and conducts business, and has its principal place of business, in New York, New York.

38.     Defendant AIG's headquarters is located at 175 Water Street, New York, New York 10038.

39.     Upon information and belief, AIG is required to file reports with the SEC under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

40.     Defendant AIG is a global financial services and insurance company, which had approximately $1 trillion in assets prior to the financial crisis in 2008.  AIG lost approximately $99.2 billion in 2008.

41.     AIG's profound failures in corporate governance and the maintenance of adequate internal controls, particularly in risk management, led to the need for government intervention at that time.

42.     Defendant AIG was ultimately rescued by taxpayer money through the U.S. Treasury Department and the Federal Reserve, which, through a series of measures together, provided AIG with a $180 billion "bailout" package which was supported, ultimately, by U.S. taxpayers.

43.     In October 2016 Defendant Peter Solmssen replaced Tom Russo ("Russo") as Executive Vice President and General Counsel at AIG.

44.     In this capacity, Solmssen was also responsible for overseeing AIG's Compliance Department.

45.     While Mr. Solmssen is publicly purported to have "promoted a culture of integrity" at AIG, he left AIG involuntarily in September 2017, having served in the position for less than a year.

46.     Based on AIG's public securities filings, Solmssen received in excess of $10 million for his abbreviated tenure with the Company, at a time when it was operating at a loss.

47.     In his capacity as Executive Vice President and General Counsel, Defendant Solmssen reported to Defendant AIG's Chief Executive Officer.

48.     On March 9, 2017, Peter Hancock, Defendant AIG's then-Chief Executive Officer, announced his decision to resign, effective upon the identification and appointment of a successor Chief Executive Officer, to be selected by AIG's Board of Directors.  Following this decision, Defendant AIG communicated that its Board of Directors had commenced a search for a successor Chief Executive Officer.

49.     On May 14, 2017, Defendant AIG communicated that Mr. Brian Duperreault had been appointed as Chief Executive Officer, effective that day.  Mr. Hancock's resignation became effective that same day.

50.     Defendant Lucy Fato became Executive Vice President and General Counsel of AIG in or about October 2017.  In such capacity, Defendant Fato's reported duties included overseeing legal, compliance, and regulatory matters at AIG.

51.     Defendant Fato also served as AIG's Interim Head of Human Resources from October 2018 through July 2019.

52.     During Defendant Fato's tenure as General Counsel and/or Interim Head of Human Resources, she was responsible for managing AIG's (a) remedying of the internal control

weaknesses and compliance violations identified by Plaintiff, (b) response to the pending OSHA

complaint filed by Plaintiff seeking remediation of the harm caused to Plaintiff by Defendant

AIG's actions, and (c) processes and systems governing AIG's management of its employee

performance equity plans and the related awards issued thereunder.

     53.     During Defendant Fato's tenure and the pendency of Plaintiff's OSHA

proceeding, Defendant AIG terminated more than $1 million in Plaintiff's accrued performance

equity awards and destroyed evidence of such awards and AIG's termination thereof.  Plaintiff

informed Defendants AIG and Fato of the Company's failure to adhere to the terms of the

Agreements governing administration of its employee performance equity plans, and the absence

of internal controls to ensure its employee performance equity plans were appropriately

administered in accordance with their terms.  Notwithstanding its awareness thereof, Defendant

failed to remedy such retaliatory action or its internal control failures.

### STATEMENT OF FACTS

### PLAINTIFF HAS A LONGSTANDING RECORD OF SUCCESSFUL ACCOMPLISHMENTS AND PROMOTIONS IN HIS CAREER, INCLUDING AT AIG, WHERE HE RECEIVED NUMEROUS PROMOTIONS, POSITIVE PERFORMANCE REVIEWS AND INCENTIVE COMPENSATION

     54.     Plaintiff was originally employed by Defendant AIG as an Associate General

Counsel in AIG's Financial Services Division in December 2006.

     55.     Plaintiff received multiple promotions during his tenure with AIG, including his

promotions to Deputy General Counsel, Financial Services, and Chief of Staff for AIG's

Executive Vice President and General Counsel, Mr. Russo, before Mr. Russo promoted Plaintiff

to be the Head of the LOC.

56.     Based on his initial success in leading the LOC, Plaintiff was again promoted through the significant expansion of his responsibilities and team to include management of legal operations for AIG's Claims Litigation group on behalf of its insurance clients.

57.     During his tenure at AIG, Plaintiff never received a negative performance review, nor was he ever provided with a warning that his job was in jeopardy or given a performance improvement plan in accordance with AIG's normal human resources practices.

58.     To the contrary, throughout his more than ten-year tenure at AIG, Plaintiff received multiple increases to his base salary and multiple awards of performance-related incentive equity in various forms.

59.     Plaintiff served as Head of the LOC, with increasing responsibilities, until his termination in May 2017.

60.     As Head of the LOC, Plaintiff reported directly to AIG's General Counsel and was a member of the Company's most senior management team, who regularly participated in meetings with the Company's Executive leadership regarding the Company's strategy and developments.

61.     As Head of the LOC, Plaintiff was responsible for developing and leading the strategy, infrastructure, and team supporting the procurement, analytics, cost mitigation, and process enhancement relating to more than $2 billion in legal services provided annually by more than 1,500 law firms and other legal service providers to AIG's insureds and internal legal functions worldwide.

62.     During Plaintiff's tenure as Head of the LOC, he significantly enhanced management of outside legal costs, which was a stated strategic priority for AIG identified by AIG's Executive leadership.  Reduction in outside legal costs was also an express goal of AIG's

Legal Department for purposes of the team's performance management and the awarding of annual incentive bonuses.

63.     The legal cost savings realized by AIG during Plaintiff's tenure as Head of the LOC were reported through AIG's IT systems, pursuant to documented processes that were reviewed and validated regularly by AIG's Finance and Internal Audit Departments.

64.     As a result of the legal cost savings realized by AIG during Plaintiff's tenure as Head of the LOC, members of AIG's Legal Department were awarded the highest level of incentive compensation achievable in respect of the Department's performance goals relating to cost savings.

65.     No other functional department of AIG achieved the amount of reported cost savings, or was awarded the level of incentive compensation achieved by the Legal Department in respect of its savings-related performance goals, during Plaintiff's tenure as Head of the LOC.

66.     Moreover, as a result of initiatives and programs led by Plaintiff during his tenure as Head of the LOC, AIG realized legal cost savings in each year of his leadership of the function, with such cost savings ultimately totaling, in the aggregate, more than $1 billion by the time of Plaintiff's termination.

67.     The success of these efforts by AIG's LOC during Plaintiff's tenure won widespread industry recognition, including awards by leading industry observers such as *Corporate Counsel* magazine and the Association of Corporate Counsel.

68.     During his more than ten-year tenure at AIG, Plaintiff never received a negative performance review.  In fact, in every year of his work at AIG, including the year of his termination, Plaintiff was given a positive overall performance review.

69.     In or about March 2017, Defendant Solmssen provided Plaintiff with a positive overall annual performance review.  As a result, Mr. Katzel was awarded his full annual incentive bonus for that time period.

## BASED ON ITS POSITIVE ACHIEVEMENTS, AIG DECIDES TO CARVEOUT THE LOC INTO AN INDEPENDENT BUSINESS PURSUANT TO "PROJECT KALAHARI," AN INITIATIVE LED BY PLAINTIFF

70.     In 2015, AIG's Executive leadership, recognizing Plaintiff's success in leading the LOC, supported an initiative to convert the LOC into a new externally facing, revenue-generating business to provide its services to third party companies.

71.     The process was known internally as "Project Kalahari" and the new, externally facing business was to be conducted via a newly formed entity known as The Legal Operations Company LLC ("TLOC").

72.     As part of Project Kalahari, TLOC would be established as an independently managed business, supported by external investors, in an effort to create a new source of equity value and cost savings to AIG.  The contemplation was that AIG, together with a small number of strategic investors and management, would be the principal owners of TLOC.

73.     The business plan for Project Kalahari was developed in partnership with AIG's executive leadership and AIG's external strategic advisor, the international consulting firm Oliver Wyman ("OW").

74.     OW had a trusted relationship with AIG and was the former employer of AIG's Chief Financial Officer at the time of Project Kalahari, Sid Sankaran.

75.     The carveout AIG planned for the LOC was modeled, in part, on the successful carveout in the late 1990's of General Electric's former internal "back office" functions to create Genpact as a publicly-listed outsourced service provider.

76.     The strategic goals of Project Kalahari were based on the priorities of AIG's then-CEO Peter Hancock, including: (1) delivering on innovative methods of converting AIG's assets into new, revenue-generating products; (2) reducing AIG's overhead costs by moving the LOC's employees into an independent company, TLOC, that would thereafter deliver services to AIG for an annual fee; and (3) achieving additional cost mitigation benefits by further amplifying AIG's effective buying power through the addition of outside clients.

77.     As part of its advisory engagement with AIG in connection with Project Kalahari, OW prepared an analysis for AIG's Executive Leadership which estimated that TLOC had a potential equity value of $700 - 800 million, providing meaningful benefit to AIG shareholders.

78.     As part of Project Kalahari, the leadership team of TLOC, including Plaintiff, identified and cultivated more than 40 potential external clients for TLOC's services throughout 2016.

79.     In connection with the carveout, and at the specific request of members of AIG's Executive Leadership, Plaintiff and his senior team also held extensive discussions with several potential external investors.

80.     A group of these potential external investors delivered a written expression of interest to AIG indicating their desire to invest in TLOC pursuant to Project Kalahari.

81.     Over the course of 2016, the potential investor group held numerous meetings with Plaintiff, members of TLOC's leadership team, and representatives of AIG's Executive Leadership to evaluate TLOC's business model and prospects and to discuss their interest in investing in the business.

**AIG'S CORPORATE DEVELOPMENT TEAM LEADS EFFORT TO INTENTIONALLY UNDERMINE THE SUCCESS OF AIG'S PROJECT KALAHARI OPPORTUNITY BY CREATING AN INTENTIONALLY MISLEADING BUSINESS ANALYSIS FOR AIG'S EXECUTIVE LEADERSHIP**

82.     In response to OW's analysis of the Project Kalahari opportunity and the interest expressed by potential external investors and clients, in the summer of 2016, AIG's Executive Leadership instructed its Corporate Development team to conduct a process to maximize the potential value the Company could obtain in connection with the carveout of TLOC (the "Carveout Process").

83.     At all times during this process, AIG's Corporate Development team was led by Alon Neches ("Mr. Neches"), who assigned Konstanty Owczarek ("Mr. Owczarek"), a Managing Director of Corporate Development, day-to-day responsibility for managing the Carveout Process.

84.     A critical element of the Carveout Process was an internal evaluation, to be prepared by the Corporate Development team for AIG's Executive leadership, assessing the business opportunity presented by, and the potential valuation of, TLOC (the "Internal Evaluation").

85.     The Internal Evaluation was intended to be used by AIG to aid the Company's consideration of the terms of (a) an arm's-length services agreement under which TLOC would support AIG following the carveout and (b) AIG's participation in an ongoing investment in TLOC along with potential third-party equity investors.

86.     In connection with the Internal Evaluation, the Corporate Development team conducted a survey regarding services that the LOC provided to various AIG Claims litigation management functions and areas of AIG's Legal Department.

87.     The survey was presented by the Corporate Development team to TLOC management and AIG's Executive Leadership as a way of obtaining meaningful feedback from users of the LOC's services to assist AIG in negotiating the terms of a long-term outsourced services agreement under which a post-carveout TLOC would continue to deliver necessary legal operations services to AIG and its insureds.

88.     Instead, the Corporate Development team intentionally designed and conducted the survey to generate results that would raise doubt about the value and quality of the LOC's services, and the potential value of TLOC, in order to fraudulently cause AIG's Executive Leadership to terminate Project Kalahari.

89.     These efforts included the intentional inclusion by Mr. Owczarek and the Corporate Development team as survey participants of multiple individuals in AIG who had no direct experience as users of the LOC's services.

90.     Additionally, the survey was intentionally designed by Mr. Owczarek and the Corporate Development team to "overweight" feedback from individuals and departments who had no, or minimal, experience with the LOC's services, and limited impact on AIG's business, and to "underweight" feedback from individuals and departments with extensive experience of the LOC's services and a significant impact on AIG's business.

91.     In this way, Mr. Owczarek and the Corporate Development team manipulated the survey results to intentionally create a misleading and negative impression of the LOC's level of performance in delivering its services to internal AIG users.

92.     Individuals surveyed included, among others, Andrew Barberis ("Mr. Barberis"), Charith "Chaz" Perera ("Mr. Perera"), Tim Greensfelder, Russell Lippman, Gil Amoray, Tim Gladura, and Dave Fitzgerald.

93.     Mr. Katzel became aware of the suspect practices used in designing and conducting the surveys, and the lack of controls and processes under which they were being conducted, and raised concerns about the validity of the surveys in representing the LOC's performance to Mr. Owczarek.

94.     Mr. Neches and Mr. Owczarek exchanged correspondence regarding the concerns raised by Plaintiff at the time, in the course of which Mr. Neches acknowledged, in writing, the validity of Plaintiff's concerns about the integrity of the process being conducted by the Corporate Development team.

95.     In response to Plaintiff's concerns about the integrity of the survey, Mr. Owczarek, the Managing Director tasked with creating and administering the surveys and analyzing the TLOC business opportunity in the Internal Evaluation, stated that he shredded the survey results, destroying any audit record.

96.     As a result of Mr. Owczarek's assertion that he had destroyed the records supporting a critical element of the Corporate Development team's evaluation of the TLOC business opportunity, Plaintiff grew increasingly concerned about the internal controls governing the Corporate Development Department's management of, and retention of records relating to, the evaluation generally of strategic transactions at AIG.

97.     Mr. Owczarek and others told Mr. Solmssen, who had only been AIG's General Counsel for a few weeks at that time, and AIG's Executive Leadership team, that the survey process indicated widespread unpopularity of the quality of services provided by the LOC and the carveout generally.  The information supplied to Mr. Solmssen and AIG's Executive Leadership team in connection with its evaluation of Project Kalahari was flawed, inaccurate, corrupt, and misleading.

98.     Mr. Owczarek later conceded his shredding of the LOC evaluation surveys was contrary to his and AIG's policy.  He further conceded that he had never shredded records related to any other project that he was involved in at AIG or elsewhere.

<u>**AIG PERSONNEL DISREGARD PLAINTIFF'S WARNINGS AND INTENTIONALLY SABOTAGE THE COMPANY'S PENDING BID FOR A NEW BUSINESS OPPORTUNITY BY SHARING CONFIDENTIAL COMPANY INFORMATION WITH A DIRECT COMPETITOR**</u>

99.     Throughout 2016, Plaintiff and members of TLOC management undertook significant efforts, with the support of AIG Executive leadership, to solicit potential clients for TLOC.

100.    As part of these efforts, the leadership team of TLOC, including Plaintiff, identified and cultivated more than 40 potential external clients for TLOC's services throughout 2016.

101.    One of these potential clients was UBS AG, a major commercial and investment bank.

102.    Pursuant to a Request for Proposal (the "UBS RFP"), in the summer of 2016, UBS solicited bids from prospective providers of legal operations services to assist it in achieving additional efficiencies in its procurement and management of external legal services pursuant to a long-term outsourced services contract.

103.     The delivery of outsourced legal operations and procurement services was the core business of TLOC being developed as part of Project Kalahari.  Through its extensive experience and success in managing the procurement of legal services and achieving cost reductions for AIG and its insureds, the team at TLOC was especially well qualified to meet the requirements of the UBS RFP.

104.     With the support of members of AIG's Executive Leadership, TLOC participated in the UBS RFP.

105.     Throughout this process, TLOC management kept the Corporate Development and Executive Leadership teams apprised of TLOC's progress in the UBS RFP, while being mindful of the confidentiality obligations applicable to participants in the RFP process.

106.     In or about October 2016, UBS notified AIG's TLOC that it had been selected as one of only three candidates to participate in the final round of the UBS RFP.  UBS representatives informed TLOC management that the successful candidate in the final round of the UBS RFP would enter a long-term services contract with UBS to deliver outsourced legal operations and procurement services.

107.     Based on the UBS RFP terms, TLOC management estimated that the contract resulting from the UBS RFP had the potential to generate $10-15 million in revenue in 2017 alone, along with comparable, or perhaps increased, projected revenue in subsequent years. Such revenue had the potential to meaningfully offset the cost of AIG's receipt of legal operations services through TLOC, as well as the ability to generate significant equity value for AIG as an ongoing investor in the business.

108.     Also among the finalists in the UBS RFP was the global consulting firm, Accenture.  As a result, Accenture and AIG (through its then wholly-owned subsidiary, TLOC) were competitors for the same business opportunity estimated to have the potential to generate meaningful revenue for the successful provider.

109.     During the pendency of the UBS RFP, Mr. Owczarek notified Plaintiff of his desire to share confidential business information relating to TLOC, its team of professionals, their compensation, and the services delivered by the TLOC team (the "AIG Confidential

Information") with Accenture, purportedly to assist in the evaluation of TLOC being prepared by the Corporate Development team.

110.    Immediately after learning of Mr. Owczarek's desire to share the AIG Confidential Information with Accenture, Plaintiff alerted Mr. Owczarek in writing of his concerns that Accenture was a business competitor to TLOC and that AIG should not provide AIG Confidential Information regarding TLOC to Accenture.

111.    In subsequent correspondence, Plaintiff reiterated his concerns when Mr. Owczarek repeatedly raised his desire to share the AIG Confidential Information with Accenture. As part of such correspondence, Plaintiff noted that sharing such information would negatively impact AIG's ability to successfully pursue the TLOC business opportunity.

112.    Notwithstanding Plaintiff's warnings, AIG's Corporate Development team, operating through Mr. Owczarek, and AIG employees Chaz Perera and Lina Hu ("Ms. Hu"), intentionally shared the AIG Confidential Information with its business competitor Accenture during the pendency of the UBS RFP.

113.    The AIG Confidential Information provided to Accenture contained sensitive, non-public information regarding the costs associated with the services that TLOC planned to provide to UBS.  Such information provided Accenture with a significant competitive advantage in the UBS RFP by giving it an in-depth understanding of the TLOC operating model that it otherwise did not have and could not obtain.

114.    The AIG Confidential Information thus gave AIG's business competitor, Accenture, the ability to enhance its pricing for UBS based on an understanding of the projected pricing of one of its competitors and, therefore, develop and submit a more competitive bid for the business that was the subject of the UBS RFP.

115.    At the time Mr. Owczarek, Mr. Perera, and Ms. Hu shared the AIG Confidential Information with AIG's business competitor Accenture, AIG's compliance polices regarding the protection of AIG business secrets expressly prohibited such actions.

116.    At the time Mr. Owczarek, Mr. Perera and Ms. Hu shared the AIG Confidential Information with AIG's business competitor Accenture, all AIG employees were required to receive regular training on AIG's compliance policies prohibiting the sharing of confidential information with competitors.

117.    In fact, Mr. Katzel pointed out that sharing any data with Accenture would give it a competitive advantage and made senior AIG leaders aware that this would damage AIG's competitive position in the UBS RFP process.

118.    After receiving the AIG Confidential Information, Accenture was ultimately selected as the winning bidder in the UBS RFP and entered into a long-term agreement to provide outsourced legal operations and procurement support to UBS, pursuant to which it received, and, upon information and belief, continues to receive, significant compensation.

**AIG'S CORPORATE DEVELOPMENT GROUP INTENTIONALLY MISLEADS AIG'S EXECUTIVE LEADERSHIP ABOUT THE PROSPECTS OF PROJECT KALAHARI, LEADING EXECUTIVE LEADERSHIP TO WITHDRAW FROM THE PENDING UBS RFP AND TERMINATE THE BUSINESS.**

119.    To submit a credible proposal in the final round of the UBS RFP, and ultimately deliver services pursuant to a long-term contract with UBS, TLOC needed to complete the carveout process envisioned by Project Kalahari, and commence operations as a standalone company.

120.    This requirement was well understood by AIG Executive Leadership.  At the time of Project Kalahari's 2015 launch, TLOC management and OW informed AIG Executive Leadership that the carveout process necessarily entailed the execution of a long-term services

agreement between AIG and TLOC, in order to ensure the ongoing delivery of necessary legal operations and procurement services to AIG's Corporate Legal Department and its insurance clients.

121.    The Corporate Development team recognized this need, and undertook the Internal Evaluation (and its associated survey), in part, purportedly to support the negotiation of "arms' length" terms between AIG and TLOC in a post-carveout long term services agreement (the "AIG / TLOC Agreement").

122.    During the course of the UBS RFP, Plaintiff alerted Mr. Owczarek and the Corporate Development team multiple times of the need to conduct and complete negotiations on the terms of the AIG / TLOC Agreement so that a multi-year services agreement could be executed.

123.    As part of its intentionally misleading Internal Evaluation, the Corporate Development team sought the assistance of AIG's business competitor Accenture, which was competing at the time directly with AIG's business TLOC in the UBS RFP, to prepare an external analysis of the TLOC operating model.

124.    Accenture faced irreconcilable conflicts with AIG as both a participant in the legal procurement business that TLOC sought to enter, and also a direct competitor to TLOC in the UBS RFP, and was, therefore, incapable of producing an objective report on the TLOC operating model for AIG's Executive Leadership.

125.    Upon learning of Mr. Owczarek's desire to involve Accenture in the Internal Evaluation, Plaintiff raised concerns regarding Accenture's conflicts of interest and its inability to produce an objective, meaningful analysis that would be useful for Executive Leadership.

126.    Notwithstanding his awareness of these conflicts and Accenture's unsuitability for the task, Mr. Owczarek enlisted Accenture to prepare an analysis of TLOC's Operating Model for the Internal Evaluation (the "Accenture Analysis").

127.    In connection with the preparation of the Accenture Analysis, Mr. Owczarek and others at AIG had at least one meeting with a representative of Accenture and shared confidential and proprietary information regarding the LOC with him on at least one occasion.

128.    Unsurprisingly, working with AIG's Corporate Development team, Accenture produced an intentionally misleading report, designed to undermine the TLOC business model and inhibit its success, thereby boosting the prospects of Accenture's own business and its likelihood of success in the UBS RFP.

129.    Following its completion, Mr. Owczarek shared the Accenture Analysis with Plaintiff for his review.  After reviewing it, Plaintiff noted numerous flaws in the Accenture Analysis to Mr. Owczarek and explained why it was not a credible analysis of the TLOC business operating model.

130.    Indeed, senior representatives of AIG's own outside advisors, OW, raised concerns regarding the validity of the Accenture Analysis and the evaluation being led by the Corporate Development team to Mr. Katzel and Mr. Owczarek.  Mr. Katzel repeated OW's concerns to Mr. Owczarek.

131.    Notwithstanding his awareness of the flaws in the Accenture Analysis and the surveys, Mr. Owczarek relied on and included them in the materials relating to the Internal Evaluation.  In so doing, he and other members of the Corporate Development team created an intentionally misleading report to improperly influence the decision of Executive Leadership in evaluating the TLOC business opportunity.

132.    Prior to the deadline for submitting TLOC's final bid in the UBS RFP, a meeting of Executive Leadership was convened in order to determine how to proceed with the UBS RFP and the TLOC business opportunity.

133.    In connection with that meeting, Mr. Neches and Mr. Owczarek shared the intentionally misleading Internal Evaluation with Executive Leadership and briefed them on its contents, thereby knowingly misleading them as to TLOC's business prospects in order to influence Executive Leadership's decision on Project Kalahari.

134.    On or about October 21, 2016, having received the intentionally misleading Internal Evaluation and having been intentionally misled regarding the business prospects of TLOC by AIG's Corporate Development team, the Executive Leadership of Defendant AIG, including Defendant Solmssen, whose appointment as AIG's Executive Vice President and General Counsel had been recently announced, abruptly decided to withdraw TLOC from the UBS RFP, and terminate the Kalahari carveout and TLOC.

**PLAINTIFF FORMALLY NOTIFIES AIG'S COMPLIANCE TEAM OF (1) VIOLATIONS OF AIG'S COMPLIANCE POLICIES, (2) INTENTIONALLY MISLEADING ACTIONS OF THE CORPORATE DEVELOPMENT TEAM IN CONNECTION WITH PROJECT KALAHARI, AND (3) MATERIAL WEAKNESSES IN AIG'S INTERNAL CONTROLS REGARDING ITS PROCESSES FOR EVALUATING STRATEGIC OPPORTUNITIES AND MANAGING CORPORATE RECORDS**

135.    In January 2017, in response to a "Corruption Risk Questionnaire" circulated by AIG in support of its annual SOX compliance review, Plaintiff was asked whether he was aware of any conduct at AIG that involved, or which he had reason to suspect involved, among other things, fraud or conflicts of interest.

136.    To ensure that he completed it appropriately, before responding to the questionnaire, Plaintiff advised members of AIG's Compliance Department, Deputy Chief Compliance Officer Marie McCormack and compliance professional Scott Horton, of his

concerns regarding the suspicious, dishonest, and unethical conduct that he had witnessed in connection with Project Kalahari.

137.    In the course of his discussions with Ms. McCormack and Mr. Horton, Plaintiff discussed the requirements of the Corruption Risk Questionnaire and the appropriate actions for AIG to take in response to the suspicious conduct and evidence of internal control failures he had witnessed during the course of Project Kalahari.

138.    Taking account of the guidance provided by AIG's Compliance team, Plaintiff responded to the Corruption Risk Questionnaire by noting his concerns regarding potential intentional misconduct and conflicts of interest arising in connection with Project Kalahari, as well as evidence of weaknesses and/or gaps in the internal control environment relating to AIG's evaluation of strategic transactions and records retention practices.

139.    Plaintiff highlighted these concerns by noting in the Questionnaire that AIG should consider "review and testing on the robustness of conflict of interest protections in the processes followed by … functions responsible for significant transactions at the company." Plaintiff cited the importance of such review and testing of the Company's internal controls in order to ensure that "…company consistently follows rigorous processes and procedures that support [AIG's] ability to make and implement decisions that maximize shareholder value in such transactions."

140.    In support of his response to the Questionnaire, Mr. Katzel provided extensive documentation to Ms. McCormack relating to the Project Kalahari process, including materials demonstrating the apparent conflicts of interest, sharing of confidential materials with business competitor Accenture, and intentional destruction of corporate records relating to the Corporate Development team's Internal Evaluation.

141.   This documentation included emails and other records of AIG employees intentionally sharing AIG Confidential Information with AIG business competitor Accenture leading up to and during the UBS RFP.

142.   In raising these concerns, Mr. Katzel believed that AIG's Compliance team would conduct an investigation of the suspected misconduct he witnessed in connection with Project Kalahari and take appropriate remedial action to ensure that AIG's internal control environment relating to the evaluation of strategic opportunities, management of conflicts of interest, and retention of corporate records was sound and met all applicable legal and regulatory requirements.

143.   Mr. Katzel specifically raised concerns to AIG's Compliance team that AIG may well have violated federal fraud and securities laws by: (a) intentionally underestimating the potential equity value of a business opportunity (Project Kalahari) by manipulating the Carveout Process and artificially "rigging" the internal surveys to present a false negative impression of the LOC; (b) improperly revealing confidential information about the LOC and Project Kalahari to a business competitor during the pendency of a tangible business opportunity in which an affiliate of AIG was a participant; (c) destroying company records related to the evaluation of Project Kalahari; and (d) having no internal controls and/or processes to ensure an objective evaluation.

144.   These potential violations were further exacerbated by the lack of internal controls and compliance oversight evidenced by the incomplete compliance investigation and lack of remediation (see infra. at ¶ 146 et seq.).  Together, these flaws/violations financially damaged AIG's operations and, by extension, its shareholders and potential external investors, because a major business opportunity was lost due to the above described fraud, corrupt business practices, and conflicts of interests.

**AIG'S INVESTIGATION FINDS THAT AIG EMPLOYEES VIOLATED THE
COMPANY'S COMPLIANCE POLICIES REGARDING HANDLING OF COMPANY
BUSINESS SECRETS, BUT FAILS TO EXAMINE OTHER REPORTED COMPLIANCE
VIOLATIONS AND INTERNAL CONTROL WEAKNESSES**

145.    After receiving notice of Plaintiff's concerns, Ms. McCormack, Mr. Horton, and

AIG's Compliance team (overseen by Mr. Solmssen) launched an investigation into the

suspicious conduct Mr. Katzel described.

146.    In his capacity as Executive Vice President and General Counsel, Defendant

Solmssen was made aware of Mr. Katzel's complaint and the related investigation undertaken by

AIG's Compliance Department.

147.    As part of the compliance investigation, AIG concluded that its employees

violated AIG's compliance policies in improperly sharing AIG's Confidential Information and

other proprietary data with Accenture during the UBS RFP.

148.    As part of the investigation, Ms. McCormack and Mr. Horton spoke with a limited

subset of the parties involved in the suspicious conduct arising in connection with Project

Kalahari.  Notably, Ms. McCormack and Mr. Horton only interviewed Mr. Owczarek, Mr.

Perera, Ms. Hu, and Plaintiff as part of the investigation.

149.    During the investigation, AIG did not even attempt to recover the information

provided to Accenture in violation of the Company's compliance policies.  AIG's Compliance

Department was thus unable determine its contents, how it was used, or its level of sensitivity.

150.    In fact, AIG's compliance professionals never contacted Accenture about the

concerns raised by Plaintiff relating to Accenture's receipt of AIG Confidential Information

during its pursuit of the UBS RFP.

151.    Additionally, AIG never conducted any forensic review of its electronic mail or

other information technology infrastructure to determine which employees were involved in the

violations of AIG's compliance policies and whether, and to what extent, other misconduct occurred in connection with Project Kalahari.

152.   At the completion of the investigation, Ms. McCormack documented in a note to the file (which she also copied to Mr. Horton) that AIG's Chief Compliance Officer, Karen Nelson, advised Plaintiff that he had "valid concerns."

153.   Notwithstanding the confirmation by AIG's Compliance team of the validity of the concerns raised by Plaintiff in the Questionnaire, no formal memorandum or report of its findings was prepared.  Upon information and belief, prior to the filing of this Complaint, AIG never notified its Internal Audit Department or the Audit Committee of its Board of Directors of the compliance violations and internal control weaknesses identified by Plaintiff.

154.   Instead, the only document produced in response to Mr. Katzel's "valid concerns" about AIG's internal control weaknesses and compliance violations was a two-page draft memorandum, confirming that AIG personnel improperly shared information with Accenture, but leaving the remaining concerns regarding destruction of corporate records, management of conflicts of interest, and lack of internal controls governing the evaluation of material strategic business opportunities unaddressed.

155.   Upon information and belief, Ms. McCormack personally briefed Mr. Solmssen on the findings of the investigation.

156.   After Plaintiff's completion of the Questionnaire and the commencement of the compliance investigation, Mr. Solmssen's attitude toward Plaintiff changed from cordial to strained and difficult.

157.   AIG did not confirm the destruction of the information that AIG personnel sent to Accenture until May 2017, months after the completion of the compliance investigation.

158.    Suspiciously, AIG sought to confirm the destruction of the information that AIG

personnel sent to Accenture only after Mr. Katzel's termination and following Mr. Katzel's

notification to AIG that he had retained counsel to represent him in connection with his

termination by AIG.

## DEFENDANT SOLMSSEN UNDERTAKES AN INTERNAL REVIEW OF THE LOC WHICH CONFIRMS ITS HIGH LEVEL OF PERFORMANCE

159.    Only days after terminating the UBS RFP and carveout, Mr. Solmssen emailed

Jeffrey Hurd ("Mr. Hurd"), AIG's Chief Operating Officer at the time, sharing his interest in

undertaking a comprehensive internal review of the LOC.

160.    In announcing the termination of TLOC and launching this review, Defendant

Solmssen explained to Plaintiff and the members of the LOC that he considered the LOC an

important asset of the Company which delivered great value to AIG and which could deliver

even greater benefit to AIG by focusing on the delivery of its services to its internal clients and

insureds, as opposed to providing services both to AIG and the broader marketplace.

161.    Defendant Solmssen also claimed that the surveys conducted in connection with

the Internal Analysis had identified dissatisfaction among AIG users with the quality of the

LOC's services.

162.    However, in launching his review, Defendant Solmssen conceded internally to

other AIG employees that he was aware that the Internal Analysis and the related surveys were

flawed.

163.    Mr. Solmssen expressed a desire to leverage the widely used corporate analysis

and improvement process known as "DMAIC" - Define, Measure, Analyze, Improve, and

Control - to identify opportunities to improve the LOC's services to internal AIG clients.

164.    DMAIC is a widely recognized, structured, data-driven method to identify opportunities to improve business processes, and to help companies explore possible solutions, make decisions on future actions, and implement process controls to generate measurable benefits.

165.    In November 2016, Mr. Solmssen commenced the DMAIC process relating to the LOC to purportedly evaluate and identify opportunities to improve the function as an internal provider of legal operations services for AIG and its insureds.

166.    AIG insureds relied on the services provided by the LOC in managing the membership, rates and terms of AIG's approved panels of outside counsel, who provided critical legal defense services to AIG's insureds pursuant to the insurance policies they purchased from AIG.

167.    Defendant Solmssen asserted that he was highly familiar with the DMAIC process and had won awards for completing that process for his previous employer General Electric.

168.    In assembling the team to assist with this important project, Plaintiff selected members of the LOC team who were certified Six Sigma Master Black Belts who had completed numerous DMAIC projects over the course of their careers.

169.    Plaintiff and his team were actively engaged in working with the AIG employees that Mr. Solmssen selected to conduct the DMAIC process and undertook significant effort to provide extensive information regarding the LOC and its processes in response to their requests over the course of several months.

170.    Data collected in the DMAIC project revealed that the LOC processes subject to the evaluation were, in fact, highly successful in meeting expected service level requirements for AIG's internal clients.

171.    After members of the LOC team familiar with the DMAIC process worked with the team assigned by Defendant Solmssen on the project for several months, Mr. Solmssen's DMAIC process, by his own admission, ultimately failed in the spring of 2017 to identify any meaningful process improvements for the operations of the LOC.  In sum, the LOC was operating effectively and was diligently and efficiently delivering quality services to AIG's internal clients and insureds in accordance with expectations.

172.    In internal written communications, Defendant Solmssen and other AIG executives indicated that their intent in launching the DMAIC process was not, in fact, to improve LOC processes for the benefit of AIG's internal clients and insureds, but to create a pretextual justification for reducing the LOC's headcount.

173.    Unable to achieve the result he desired after months of work on the DMAIC project, Mr. Solmssen unexpectedly saddled Mr. Katzel with the vague assignment to identify areas of improvement for the LOC, despite Defendant Solmssen's self-described tested and proven process expertise and the plentiful resources that had already been devoted to accomplishing this task.

174.    In giving Mr. Katzel this assignment, Mr. Solmssen gave Plaintiff no direction as to his priorities for the LOC as head of the Legal Department, few if any dedicated resources, and limited time to accomplish what the DMAIC process overseen by Solmssen himself had failed to deliver after months of a sizable team effort.

175.    After Plaintiff provided a written proposal for enhancements to the LOC, based in part on written feedback provided by one of the LOC's most significant internal users, the Casualty Claims group, Solmssen directed Plaintiff to prepare alternatives setting forth potential reductions in the LOC's professional team.

176.     Plaintiff delivered the personnel reduction alternatives requested by Solmssen promptly following his request.  In response, Defendant Solmssen expressed his satisfaction with the alternatives provided by Plaintiff.

**AIG, LED BY DEFENDANT SOLMSSEN, TERMINATES PLAINTIFF'S EMPLOYMENT IN RETALIATION FOR REPORTING CONCERNS ABOUT AIG'S INTERNAL CONTROLS REVEALED IN THE PROJECT KALAHARI PROCESS**

177.     Shortly thereafter, Mr. Solmssen abruptly terminated Mr. Katzel on May 4, 2017.

178.     There are no written evaluations or explanations supporting Mr. Solmssen's decision to fire Plaintiff, who was a long-term member of AIG's senior management team and a consistently high performer with the Company.

179.     AIG never asserted that Katzel was terminated "for cause" or that his termination was based on poor performance.

180.      Mr. Solmssen has been unable to put forward any clear explanation for why he terminated Mr. Katzel.  Mr. Solmssen, in sworn statements, has provided inconsistent explanations for his decision to fire Mr. Katzel.  Mr. Solmssen's decision to terminate Plaintiff, a senior member of the Legal Department responsible for leading a critically important function for the Company's insureds and internal Legal clients, occurred after the Company had selected, but shortly before the arrival of, Mr. Duperreault as AIG's new CEO.

181.     The day before Mr. Katzel's termination, Mr. Solmssen requested and received talking points from Human Resources professional David Lee ("Mr. Lee") on how to address Plaintiff at his termination meeting.

182.     Mr. Lee's notes suggested that Mr. Solmssen simply convey to Plaintiff that AIG would be making changes to the LOC and that Human Resources would provide guidance and information to Plaintiff regarding his severance and other termination materials.

183.   At the time of Plaintiff's termination, Mr. Solmssen summoned him to his office under false pretenses, notifying Plaintiff sarcastically that he would not be continuing at AIG.

184.   On another occasion, Mr. Solmssen offered that he fired Plaintiff because, while the DMAIC project was ongoing, he gave Mr. Katzel the assignment to "fix" the LOC himself and Katzel was not successful.  This purported justification was particularly disingenuous as Mr. Solmssen's own investigation revealed that there was no "fix" needed for the LOC.

185.   As another explanation for his decision to terminate Plaintiff, Mr. Solmssen claimed that Mr. Katzel was unwilling to make unspecified changes to the LOC, notwithstanding Solmssen's failure to provide Mr. Katzel with any guidance whatsoever on his priorities or desired areas of improvement for the LOC.

186.   Immediately after Mr. Solmssen terminated him, Mr. Katzel was unceremoniously removed from his office and was not provided with the opportunity to explain his sudden departure to his team or professional contacts in the manner that other previously terminated senior AIG managers had been accorded.

187.   Instead, Mr. Katzel was treated as if he had done something improper and, thereafter, AIG actively promoted this fiction internally, to the public, and to the press.

188.   Compounding the sudden nature of his departure, AIG refused to provide Mr. Katzel any leeway in orchestrating a way to transition out of his role with the Company.

189.   Instead of giving him any latitude, AIG sought to have Plaintiff "pre-clear" the parties with whom he could speak with or notify of his departure and the circumstances under which it occurred.

190.   Soon after Mr. Solmssen abruptly terminated Plaintiff, AIG shut off his access to company communication and IT systems without notice, thereby compounding Plaintiff's

inability to communicate with his professional contacts regarding the circumstances of his departure in a way that would preserve his professional reputation and future opportunities.

191.    This abrupt action was even more surprising considering that (a) Mr. Katzel had spent ten successful years with the Company and, by Mr. Solmssen's and AIG own admission, posed no risk of inappropriate behavior or threat to security; and (b) numerous other former AIG senior managers had been afforded the opportunity to remain with the Company during a transition period, in which they were given the opportunity to communicate through AIG's IT systems with their professional contacts regarding the circumstances of their departure and their future plans.

192.    Additionally, when contacted for follow-up on an article in *Corporate Counsel* magazine for an article featuring Mr. Katzel, AIG refused to provide positive feedback on Mr. Katzel or his over ten (10) years of service.

### AIG, UNDER DEFENDANT FATO'S OVERSIGHT, TERMINATES MORE THAN $1 MILLION IN PLAINTIFF'S ACCRUED PERFORMANCE EQUITY AWARDS DURING PENDENCY OF, AND IN RETALIATION FOR PURSUING, CLAIMS EXPOSING INTERNAL CONTROL FAILURES

193.    Defendant Solmssen, after less than one year of service as AIG's Executive Vice President and General Counsel, was terminated by AIG in September 2017.  Upon his termination, Defendant Solmssen was awarded more than $10 million in severance payments by AIG.

194.    Under the terms of AIG's executive severance package, executives are not eligible for severance awards if the executives are terminated "for cause."

195.    Defendant Lucy Fato became Executive Vice President and General Counsel of AIG in or about October 2017.

196.     On or about October 27, 2017, Plaintiff submitted a Complaint with OSHA, reporting the weaknesses in AIG's internal control environment, the intentional deception by AIG management of its executives in connection with a significant business opportunity, and AIG's retaliatory termination of his employment, in violation of applicable provisions of SOX and Dodd-Frank.

197.     Defendant Fato also served as AIG's Interim Head of Human Resources between October 2018 through July 2019.

198.     While this matter was before the OSHA investigator, between February 1 and June 19, 2018, AIG eliminated over $1,027,678 of Plaintiff's accumulated performance equity interests and Common Stock, and all evidence thereof, without providing any notice or justification.  This amount represented all of Mr. Katzel's accumulated performance-related equity interests and Common Stock.

199.     AIG affirmatively eliminated Plaintiff's equity awards and Common Stock notwithstanding his pending claims against AIG and in violation of Defendant's obligation to collect, preserve, and produce evidence relating to Plaintiff's complaint.

200.     While employed, AIG awarded Mr. Katzel equity interests in various tranches based on his annual job performance under the terms of AIG's Long-Term Incentive Plan ("LTIP"), the contract governing the delivery and administration of the Company's equity compensation program and other performance equity plans.

201.     AIG maintained Mr. Katzel's equity interests in an account at UBS on his behalf. In this context, AIG regularly caused UBS to produce records of the balance and treatment of Plaintiff's performance equity awards.

202.     AIG's Human Resources department had responsibility for the management of performance equity accounts of its employees.

203.     As the interim head of Human Resources Ms. Fato was in a position where she had knowledge of, and oversaw the policies, practices, and procedures governing, employee equity accounts.

204.     Moreover, Ms. Fato was aware of the concerns raised by Mr. Katzel regarding weaknesses in AIG's internal control environment, his retaliatory termination and the proceeding pursued by Plaintiff against AIG with OSHA.

205.     Pursuant to the LTIP Plan, performance equity units were to vest and subsequently convert into shares of AIG common stock to be delivered by the Company according to a prescribed schedule upon the satisfaction of specified conditions.

206.     The LTIP set forth the terms and conditions governing the delivery (and in specified circumstances, forfeiture) of accrued equity compensation upon the Company's termination of an employee.

207.     In an "involuntary Termination without Cause," such as the Company's termination of Plaintiff, Section 6.B of the LTIP Plan provides that all of the employee's outstanding equity awards immediately vest and the related shares of AIG common Stock become deliverable, ". . . on the dates that the applicable Award would otherwise have been delivered if the Participant had continued to remain Employed," subject to the terms set forth in Section 6.G of the Plan.

208.     AIG justified its decision to terminate the equity awards on the grounds that Mr. Katzel did not sign a release of his legal claims – then pending before OSHA – relating to AIG's retaliatory termination of his employment.

209.     The release would have required Mr. Katzel, in violation of SEC rules and regulations, to waive his claims, and to falsely disavow his knowledge of any compliance issues or misconduct in order to receive his earned equity, notwithstanding the pendency of those

claims before OSHA and his disclosure of the compliance issues to AIG's Compliance Department, General Counsel, OSHA and the SEC.

210.    On multiple occasions during the pendency of Plaintiff's claims before OSHA, Defendant AIG, acting through its representatives Defendants Fato and counsel Dechert LLP, has sought explicitly to force Plaintiff to release his legal claims under Dodd-Frank and SOX against AIG with threats regarding the termination of his performance equity awards.

211.    Finally, upon information and belief, AIG continued its retaliatory behavior after Mr. Katzel's termination by having its employees inform people within Mr. Katzel's professional network that Plaintiff was engaged in a frivolous dispute with AIG.  Such communications affirmatively harmed Plaintiff's ability to secure subsequent employment opportunities.

212.    Mr. Katzel suffered additional and special damages beyond loss of earnings as a result of AIG's retaliatory conduct.

213.    Plaintiff suffered emotional damages and attended therapy on a regular basis to treat ongoing concerns and health issues caused, in part, by AIG's retaliatory termination and post-employment retaliation.

214.    Although Mr. Katzel attempted to mitigate his damages by searching for new employment, guest lecturing at his alma mater, and starting a consulting business, he was unable to find comparable employment to his position at AIG until February 2020.

215.    In order to obtain comparable employment, Plaintiff relocated from New York to California, incurring substantial cost.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(SOX WHISTLEBLOWER RETALIATION: 18 U.S.C. § 1514A — AIG AND MR. SOLMSSEN)**

216.    Plaintiff repeats and realleges the allegations in paragraphs 1 to 215 as if fully set forth herein.

217. Defendant AIG and Defendant Solmssen have violated Section 806 of the Sarbanes Oxley Act of 2002 ("Sarbanes Oxley Act") (18 U.S.C. § 1514A) because their decision to terminate Plaintiff's employment was motivated, in part or in whole, by his providing information to his supervisors about conduct that he reasonably believed violated federal laws designed to protect shareholders and investors.

218. Defendant AIG is covered by the Sarbanes Oxley Act because, upon information and belief, it (a) has "a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l)"; and (b) it "is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 7o (d))" 18 U.S.C. § 1514A(a).

219. Plaintiff engaged in activity that is protected by 18 U.S.C. § 1514A when he informed AIG compliance department and, indirectly, his supervisors at AIG about (a) conduct that he reasonably believed violated "provision[s] of Federal law relating to fraud against shareholders," including, but not limited to, 18 U.S.C. § 1843, 18 U.S.C. § 1348, and the regulations promulgated thereunder; and (b) dishonest, unethical and fraudulent corporate conduct as well as inadequate internal controls that would fail to prevent, or allow, activity that might ultimately lead to shareholder fraud or harm, including, but not limited to, violations of 15 U.S.C. § 7241 and 15 U.S.C. § 7562.

220. Approximately five months after Plaintiff informed his supervisor and the Compliance Department about this conduct, AIG terminated his employment. Moreover, Plaintiff's supervisor Solmssen singled him out, subjecting him to onerous obligations and harassment prior to his termination, after Plaintiff alerted Defendant AIG to this conduct. Defendant has violated 18 U.S.C. § 1514A because Plaintiff's protected activity was a contributing factor in its decision to terminate his employment.

221.    Immediately after his termination, AIG and Solmssen significantly harmed Plaintiff's reputation by cutting off his IT access and having him removed from the building without a chance to address his employees or his professional contacts.

222.    As a result of Plaintiff's protected activities under SOX, Plaintiff was unlawfully retaliated against and ultimately terminated in retaliation and suffered adverse employment actions prohibited under SOX.

223.    Pursuant to 18 U.S.C. § 1514A, Plaintiff is entitled to relief in in the form of back pay, front pay, attorneys' fees, emotional and reputational damages, in an amount not readily ascertainable, but to be determined after a full and fair hearing of the merits of Plaintiff's claims at trial and presently believed to be an amount in excess of $5 million, exclusive of the accrued interest thereon.

### AS AND FOR A SECOND CAUSE OF ACTION
### (SOX AND DODD-FRANK POST-TERMINATION WHISTLEBLOWER
### RETALIATION: 18 U.S.C.§ 1514A — AIG AND MS. FATO)

224.    Plaintiff repeats and realleges the allegations in paragraphs 1 to 223 as if fully set forth herein.

225.    Defendant AIG and Defendant Fato have violated 18 U.S.C. § 1514A and the whistleblower protection provisions of the DFA because they engaged in post-termination retaliation against Plaintiff in connection with their decision to eliminate more than $1 million of Plaintiff's performance-related equity awards, including more than $200,000.00 of vested Common Stock awards.  Their actions were motivated, in part or in whole, by his providing information to OSHA and the SEC about conduct that he reasonably believed violated federal laws designed to protect shareholders and investors from fraud.

226.    Approximately a year after Plaintiff was terminated, and months after he filed his initial action at OSHA, which was forwarded to the SEC, AIG's Human Resources Department

further retaliated against Plaintiff by eliminating his performance equity awards without

justification and in violation of SEC Rule 21F-17 in that it was designed to impede his ability to

communicate with the SEC about possible securities law violations.

227.    Pursuant to 18 U.S.C. § 1514A and the whistleblower protection provisions of the

DFA, Plaintiff is entitled to relief in the form of the reinstatement of his terminated performance-

related equity awards, or the payment of damages equal to the value of those forfeited awards,

attorneys' fees, emotional and reputational damages, in an amount not readily ascertainable but

to be determined after a full and fair hearing of the merits of Plaintiff's claims at trial and

presently believed to be an amount in excess of $2.5 million, exclusive of the accrued interest

thereon.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(COMMON LAW BREACH OF CONTRACT — AIG)**

228.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 227 as if

fully set forth herein.

229.    Plaintiff had an enforceable agreement with AIG pursuant to the LTIP Plan and,

per that agreement, he earned stock and equity under a pre-defined vesting schedule.

230.    Mr. Katzel performed all aspects required of him under the contract and, as such,

was awarded AIG stock and other equity awards pursuant to the contract.

231.    Those awards vested and were no longer in AIG's control.

232.    Defendant AIG, after learning that Mr. Katzel has commenced a SOX retaliation

action before the OSHA decided to terminate these awards and revoke the equity it had

previously granted him.

233.    The equity awards exceeded $1.2 million dollars and, since Defendant AIG canceled those awards and Plaintiff is no longer in possession of that equity, Plaintiff has sustained substantial damage as a result.

234.    Plaintiff is entitled to relief in an amount not readily ascertainable but to be determined after a full and fair hearing of the merits of Plaintiff's claims at trial and presently believed to be an amount in excess of $1.5 million, exclusive of the accrued interest thereon.

## AS AND FOR A FOURTH CAUSE OF ACTION
## COMMON LAW TORTIOUS INTERFERENCE WITH CONTRACT — AIG AND MS. FATO)

235.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 234 as if fully set forth herein.

236.    Defendant AIG and Defendant Fato tortuously interfered with a valid contract between Plaintiff and UBS.

237.    Plaintiff had a valid agreement with a third party, UBS, for the maintenance and safe keeping of equity Plaintiff earned as part of his incentive compensation with AIG.

238.    Defendant had knowledge of these incentive plans and Plaintiff's accounts therein, as the accounts were managed through AIG's HR Department, which, for a time, was led by Ms. Fato.

239.    Defendant AIG intentionally and improperly procured a breach of this agreement by canceling and otherwise revoking the vested equity in Mr. Katzel's accounts shortly after Mr. Katzel brought an action before the OSHA.

240.    The equity awards exceeded $1.2 million dollars and, since Defendant AIG canceled those awards and Plaintiff is no longer in possession of that equity, plaintiff has sustained substantial damage as a result.

241.    Plaintiff is entitled to relief in an amount not readily ascertainable but to be determined after a full and fair hearing of the merits of Plaintiff's claims at trial and presently believed to be an amount in excess of $1.2 million, exclusive of the accrued interest thereon.

**WHEREFORE** Plaintiff seeks judgment against Defendants:

A.  Awarding Plaintiff "all relief necessary to make [him] whole" (18 U.S.C. § 1514A(c)(1); 12 U.S.C. § 5567(c)(4)(D)(ii), including, but not limited to:

   a.  Awarding Plaintiff his monetary damages consisting of back pay, with interest (18 U.S.C.1514A(c)(2)(B); 12 U.S.C. § 5567(c)(4)(B)(i)(II) in an amount not readily ascertainable but to be determined upon a full trial on the merits but presently in excess of <u>$5 million</u>;

   b.  Awarding Plaintiff his monetary damages for the retaliatory deprivation of his equity awards by AIG in violation of SOX and the DFA in an amount not readily ascertainable but to be determined upon a full trial on the merits but presently in excess of <u>$1.5 million</u>, together with statutory liquidated damages equal to one times his compensatory damages pursuant to the DFA.

   c.  Awarding Plaintiff emotional distress damages for the anxiety and emotional distress which he experienced from his retaliatory discharge in an amount not readily ascertainable but to be determined upon a full trial on the merits but presently in excess of <u>$1 million</u>.

   d.   Awarding Plaintiff reputational damages for the reputational harm that he has experienced from his retaliatory discharge in an amount not readily ascertainable but to be determined upon a full trial on the merits but presently in excess of <u>$1 million.</u>

e.  Compensating Plaintiff for all additional special damages sustained as a

result of the discharge, discrimination and retaliation, including litigation

costs, expert witness fees, and reasonable attorney fees (18 U.S.C. §

1514(c)(2)(B); 12 U.S.C. § 5567(c)(4)(D)(ii); and

B.  Granting such other and further relief as the Court deems appropriate.

## JURY DEMAND

242.  Plaintiff respectfully demands that this matter be tried before a jury.

Dated: September 3, 2020
New York, New York

THE LAW OFFICES OF
NEAL BRICKMAN, P.C.

By: _____

Neal Brickman, Esq. (NB-0874)
420 Lexington Avenue, Suite 2440
New York, New York 10170
(212) 986-6840
Neal@Brickmanlaw.com
*Attorneys for Plaintiff Aaron Katzel*

To:   Andrew J. Levander, Esq.
      Benjamin E. Rosenberg, Esq.
      Dechert LLP
      1095 Avenue of the Americas
      New York, NY 10036
      (212) 698-3500
      Andrew.levander@dechert.com
      Benjamin.rosenberg@dechert.com
      *Attorneys for Defendant*