# Exhibit III



THE
BOYD
LAW
GROUP,
PLLC

370 Lexington Avenue
Suite 1012
New York, NY 10017-6504
(212) 867-3675 (office)
(646) 762-9985 (direct dial)
(212) 867-5765 (facsimile)

Patrick J. Boyd, Esq. | *Partner*
68 Southfield Avenue, Suite 100
Two Stamford Landing
Stamford, CT 06902-7223
(203) 921-0322 (office)
(203) 975-1110 (facsimile)
pboyd@theboydlawgroup.com

October 27, 2017

**VIA FEDEX AND FACSIMILE**
Occupational Safety and Health Administration
Region 2
201 Varick Street, Room 908
New York, New York 10014
f (212) 620-4121

**Re:  Aaron Katzel v. American International Group, Inc.**

Dear Sir or Madam,

We have been retained to represent Aaron Katzel ("Katzel", "Mr. Katzel" or "our client") in his complaint against American International Group, Inc. (hereinafter "AIG" or the "Company") for retaliation in violation of the Sarbanes-Oxley Act of 2002 ("Sarbanes" or "SOX") (as amended by the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank" of "DFA"), Pub. L. 111–203 § 929A (2010)) and the whistleblower protection provision of Dodd-Frank 18 U.S.C. §1514A; §78u-6(h)(1)(A)(i)-(iii) (collectively the "Acts").  The Acts prohibit retaliatory actions against employees who provide information relating to perceived or actual violations of enumerated securities laws and regulations.  We ask that you direct all correspondence regarding this matter and our client to our attention. [1]

We submit this letter to provide a recitation of the law and its application to the facts in support of the fundamental elements of Mr. Katzel's complaint of whistleblower retaliation.  We do not offer supporting affidavits at this time because we believe doing so would be premature, particularly since this submission is made partially in anticipation of a federal court filing.  We refrain from offering an abundance of case law for the same reason.  We do, however, encourage you to contact any and all parties referenced herein in order to investigate and verify the contents of this statement.

I.      **Mr. Katzel's Background and His Work with AIG**

Mr. Katzel is a graduate of Columbia University and the University of Pennsylvania School of Law.  After nearly ten years of private legal practice with top-ranked law firms in New York, Paris and Frankfurt, he commenced work for AIG in December 2006 as Associate General Counsel in AIG's Financial Services Division.  During his more than ten years at AIG, Katzel was promoted four times, served as a member of AIG's senior management team since 2011 and, in recognition of his seniority and contributions to the Company, was awarded seven figure compensation packages including shares in AIG stock.

---

[1] Please note that our intention is also to file complaints against individuals if this matter eventually is transferred to federal district court.  We have, as such, included some specific allegations in relation to such individuals herein.



THE
BOYD
LAW
GROUP,
PLLC

October 27, 2017
Page | 2

At the time of his termination, Mr. Katzel was one of a small group of senior leaders reporting directly to AIG's General Counsel and a member of the Company's "Executive Leadership Group." As part of this group of the Company's most senior executives, Mr. Katzel regularly participated in discussions regarding the Company's strategy and the ongoing development of its business and financial prospects with AIG's CEO and his direct reports.

In 2011, amid the Company's increasing focus on better cost management, AIG's then-Executive Vice President and General Counsel, Tom Russo ("Russo" or "Mr. Russo"), promoted Mr. Katzel to lead a legal operations function responsible for, among other things, managing the then approximately $300 million in annual outside legal costs for AIG's Global Legal Compliance and Regulatory Department ("GLCR"). Based on Mr. Katzel's documented cost mitigation achievements in this role (which served, among other things, as the basis for bonus compensation awarded to the entire senior GLCR team), in 2012 Mr. Russo, in partnership with Eric Martinez, AIG's then-Global Head of Claims, promoted Mr. Katzel once again.

In his new role, Mr. Katzel was given the responsibility, and an annual budget of nearly $25 million, to create and lead a single, company-wide, global legal operations team (the "Legal Operations Center" or "LOC"). To achieve further cost reductions for AIG and gain deeper insights across a significantly broader set of data, Mr. Katzel's new team was given responsibility for all elements of procurement, analytics, cost mitigation and process enhancement in connection with the nearly $2.5 billion in legal services provided annually by more than 1,500 law firms and other legal service providers to AIG's insureds and internal legal functions.

Under Mr. Katzel's leadership, the LOC delivered numerous documented, industry-leading benefits to AIG, including, among others:

(i)      the world's largest implementation of a legal e-billing system;

(ii)     creation of the industry's most-advanced, real-time legal analytics platform;

(iii)    automation of over 100 separate legal processes, covering more than 1 million individual transactions; and

(iv)     reduction of AIG's external legal costs by over $1 billion in the aggregate.

In every year of its operation under Mr. Katzel's leadership, the LOC achieved cost savings for AIG of more than $150 million, as documented by the Company's internal systems and validated by the Company's Corporate Finance and Internal Audit Departments. Based on these and other accomplishments, Mr. Katzel and his team were selected in 2015 by a jury of independent legal industry leaders and past award winners as an Association of Corporate Counsel ("ACC") Value Champion.

During his more than ten-year tenure with AIG, Mr. Katzel received only positive overall annual and mid-year performance reviews from his four different managers at the Company. In fact, as recently as March 2017, just two months prior to his summary termination, Mr. Katzel was given yet another positive overall annual performance review and awarded his full year-end bonus by the Company's then General Counsel, Peter Solmssen ("Solmssen"), who succeeded Mr. Russo



October 27, 2017<br>Page | 3

in October 2016.[2] Mr. Katzel never received a negative performance notice or warning during his entire tenure at AIG.

In recognition of his accomplishments at AIG, Mr. Katzel was, and is still, frequently invited to present on topics related to his area of expertise at numerous industry conferences, and continues to be recognized as an industry leader in his field. Mr. Katzel was extensively interviewed just recently for the cover story of July 2017's *Corporate Counsel* magazine on his successful in house experience and expectations for the future of the legal industry.

## II.    AIG's Mishandling of Project Kalahari

Based on the LOC's recognized successes, in 2015 Mr. Katzel received the support of AIG's executive leadership to convert AIG's internal Legal Operations Center into a new, externally facing, revenue-generating business. Modeled on the recognized success that GE demonstrated in deriving significant value from its Genpact business, AIG's new business, known internally as Project Kalahari ("Kalahari"), would deliver world-leading legal analytics and procurement services on an outsourced basis to AIG and large, external commercial clients.

Confronted by a challenging market for its primary commercial property and casualty businesses, Kalahari was designed to support three of AIG's strategic goals:

(i)     deliver on innovative ways to convert AIG's data assets into new, revenue-generating products;

(ii)    reduce AIG's headcount-related costs by moving the nearly 80 professionals in the LOC into an independent, standalone company, supported by outside capital, that would deliver services to AIG for an annual fee under a contract; and

(iii)   achieve additional legal cost mitigation benefits by further amplifying the Company's effective buying power through the addition of outside clients.

Under Mr. Katzel's leadership, Kalahari developed a pipeline of more than 40 potential clients for its services pursuant to a comprehensive business plan vetted by the Company's executive leadership and prepared in consultation with the Company's external strategic advisor, Oliver Wyman ("OW"). In October 2016, one of these potential clients, UBS, selected Kalahari as one of three finalists in a formal Request for Proposal ("RFP") that had the potential to generate $10-15 million in revenue in 2017.

---

[2] AIG recently announced its termination of Mr. Solmssen, after less than one year of service as General Counsel. Apart from a vague reference to his "returning to retirement," no explanation was given for the Company's sudden termination of Solmssen after an unusually short tenure. It is also noteworthy that the Company has recently terminated two additional executives involved with the Kalahari decision, former Chief Operating and Transformation Officer Jeffrey Hurd, and former CEO of Commercial Insurance, Rob Schimek.

 THE
BOYD
LAW
GROUP,
PLLC

October 27, 2017
Page | 4

As part of an extensive advisory engagement to assist in developing Kalahari's business model, OW, AIG's own strategic advisor, estimated the potential equity value of the Kalahari business at $700-800 million. The business's significant potential equity value was further validated by the documented interest of experienced independent private equity investors, who repeatedly expressed their desire to invest significant additional capital to support the growth of the business during a period of more than one year of review and engagement with the business and its senior management team.

To realize this value, in the summer of 2016 AIG launched a formal process, led by its Corporate Development team,[3] to carve out Kalahari from AIG and sell some or all of the business to external investors.

Unfortunately, AIG's recently-appointed General Counsel, Mr. Solmssen, failed to appreciate the value of the Kalahari business. Additionally, Solmssen was either unaware of, or disregarded, the impact of significant flaws in AIG's process for evaluating strategic opportunities such as Kalahari, which Mr. Katzel subsequently identified. Solmssen decided, soon after his arrival in October 2016, to abruptly pull out of the UBS RFP, terminate efforts to sell the business to external investors, and wind it down. Solmssen took these actions notwithstanding the immediate, concrete opportunities that Project Kalahari presented to generate value and reduce costs for AIG (and the investment of millions of dollars and years of work that had gone into the development of Kalahari and the LOC to benefit AIG's shareholders and insureds). Internal AIG documents show that this decision to abandon the $700-800 million in potential shareholder value represented by Kalahari was based on an intentionally misleading analysis prepared in bad faith by AIG's Corporate Development team under the oversight of Alon Neches, with the support of its Shared Services group, led by Charith "Chaz" Perera.

There is also substantial evidence that the deceptive Corporate Development analysis was influenced by AIG's collusion with Accenture, an external competitor of Kalahari, which was competing in the very same UBS RFP in which AIG's Kalahari business was a finalist. The Accenture conflicts extended beyond the UBS opportunity, as Accenture not only had relationships with members of AIG's management, but also sought to sell outsourced procurement services to AIG in the same area as Kalahari. In fact, internal AIG documents confirm that representatives of senior AIG management improperly shared confidential information, in violation of AIG compliance policies, about the Kalahari business with Accenture during the UBS RFP and the evaluation of the Kalahari opportunity.[4]

---

[3] Throughout AIG's recent history, the group responsible for evaluating and implementing strategic transactions on behalf of the Company has been called, variously, the Mergers & Acquisitions Group, the Strategic Transactions Group, and the Corporate Development Group. Regardless of its title, each of these groups, under the leadership of Brian Schreiber and subsequently Alon Neches, has had the same fundamental purpose – to evaluate whether potential strategic business transactions had a meaningful opportunity to deliver value to the company and its shareholders, and to pursue those that did.

[4] Soon after Solmssen's decision to terminate Kalahari, Accenture was selected as the winning participant under the UBS RFP, with the illicit support of AIG's Shared Services and Corporate Development teams. The impermissible diversion of this multi-million dollar corporate opportunity to Accenture was supported



October 27, 2017
Page | 5

Key to the misleading Corporate Development "analysis" of Kalahari was a suspiciously one-sided, negative report on internal client feedback relating to the LOC's services. When our client, surprised by the unusual consistency of the reported feedback, inquired about the methodology and support for the report's conclusions, he was told by senior representatives of the Corporate Development team that the relevant client "interview notes" for the analysis had been destroyed after the report's completion. This communication, delivered during the pendency of the Kalahari carveout process, appeared extremely suspicious to Mr. Katzel, because it indicated the intentional elimination of an auditable record of any subsequent decision regarding the business.[5]

The validity of the Corporate Development "analysis" was further called into question by subsequent discussions with the LOC's internal clients, who directly contradicted views attributed to them in the report. Indeed, in a subsequent review of the function conducted under the direction of the then-General Counsel himself (the "DMAIC process"), the very same clients expressed views of the LOC and its services that flatly contradicted those attributed to them in Corporate Development's earlier "analysis." In fact, the feedback provided by the LOC's largest clients in the DMAIC process stated that the LOC's services were necessary, could not be provided independently by the LOC's clients, and that the level of service provided by the LOC uniformly met or exceeded established service level agreements and/or industry standards. The overall DMAIC process concluded that the level of service by the LOC was uniformly high and/or industry-leading, and that the only meaningful improvement opportunities involved enhancing communications with its internal clients.

### III.     Katzel Calls Attention to Compliance Violations, Conflicts of Interest, and Systemic Concerns Regarding AIG's Process for Reviewing Strategic Transactions

In January 2017, in response to an annual compliance certification he was asked to endorse, our client expressed concerns about the integrity of the process used by AIG to evaluate and pursue strategic transactions, as evidenced by the stunning governance failures that emerged in the

---

by AIG's corruption of its own internal corporate development process, and its provision, in violation of company compliance policies, of highly sensitive company business secrets.

[5] Subsequent interactions with the Company have confirmed that the supporting materials have not, in fact, been destroyed. At a minimum, this inconsistency raises significant questions about the integrity and credibility of the most senior members of the Corporate Development team, who in the midst of discharging their responsibility to extract value from Kalahari for AIG and its shareholders, intentionally misled the senior management of AIG and the Kalahari business. The intentionally misleading behavior of senior members of the Company's management regarding preservation of Company records also raises concerns, subsequently communicated to AIG's counsel, about the integrity and reliability of AIG's internal processes and systems for ensuring the retention and production of company records and other electronic documents generally. These concerns take on particular importance in light of the recent departure of at least three senior executives involved with the Kalahari decision. Distressingly, representatives of AIG have failed to confirm the legal and operational adequacy of the Company's procedures and systems to ensure the retention and future ability to produce all relevant materials relating to this matter, notwithstanding our numerous attempts seeking assurance on the issue.



October 27, 2017
Page | 6

Kalahari process. Notwithstanding his (subsequently validated) concerns about the potential impact such a complaint might have on his future career at AIG, Mr. Katzel raised these concerns in furtherance of his managerial fiduciary duties and based on his observations of the Corporate Development team's intentionally deceptive, corrupt process and conduct in connection with Kalahari, which he concluded inappropriately led to the diversion by AIG of the multi-million dollar UBS corporate opportunity to a business competitor, and the loss by AIG and its shareholders of a meaningful opportunity to realize up to $800 million in equity value.

In particular, Mr. Katzel raised doubts to the Company's Compliance Department (then overseen by Mr. Solmssen) that AIG's Corporate Development process contained sufficient definition and controls to ensure that strategic transactions were pursued based on their potential for maximizing shareholder value. In sharing these concerns, Mr. Katzel also highlighted that representatives of AIG had apparently destroyed company records that would have been required to support an audit of the Company's decision on the Kalahari opportunity, and had improperly shared highly sensitive confidential business information with the Company's business competitors during critical phases of the carveout and UBS bidding process.

Katzel noted, in particular, that the Kalahari opportunity to generate significant revenue and shareholder value in 2017 was abandoned based upon a flawed (or worse, intentionally misleading) process that was detrimental to AIG's shareholders while the company was operating at a loss. Simply put, Katzel identified concerns, on the basis of documentary and other evidence, that AIG's process for conducting material acquisition, disposition and strategic investment opportunities had been intentionally subverted in connection with the Kalahari opportunity. He further noted that the process was not sufficiently well-governed to consistently ensure advancement of the best interests of shareholders in pursuing material strategic transactions generally, rather than the narrow or personal agendas of internal corporate groups or members of management – particularly where conflicts of interest might be present.

IV.    **Katzel Engaged in Protected Activity and the Circumstances are Sufficient to Raise an Inference that His Protected Activity was a Contributing Factor in His Termination**

Just a few months after Mr. Katzel raised his concerns to AIG's compliance team (and through it, the Company's General Counsel) he was summarily terminated without notice. His access to company communication and IT systems was shut off, and when AIG was contacted for follow up on the above-referenced *Corporate Counsel* article, AIG's General Counsel directed the magazine's reporter to Head of Employment Law Annette Bernstein, who refused to provide positive feedback on Katzel or his years of service.

"In order to recover under the Acts, a plaintiff must show by a preponderance of the evidence that (a) he engaged in protected activity; (b) his employer was aware of the activity; (c) he suffered an adverse employment action; and (d) that the protected activity was a contributing factor to the unfavorable employment action." *See Yang v. Navigators Grp., Inc.*, 18 F. Supp. 3d



THE
BOYD
LAW
GROUP,
PLLC

October 27, 2017
Page | 7

519, 528 (S.D.N.Y. 2014) (citations omitted).  Employees need not show actual fraudulent conduct, but only that their belief or suspicion that a securities law has been violated was reasonable and the proximity of an employee's termination in relation to the date that he or she engaged in protected activity is a strong indication that Dodd-Frank's "contributing factor" element has been satisfied.  *See* 29 C.F.R. 104(e)(1); *see also Bechtel v. Administrative Review Board*, 710 F.3d 443, 447 (2d Cir. 2013); *Murray v. UBS AG*, 2013 U.S. Dist. LEXIS 71945 at *8 (S.D.N.Y. May 18, 2013); *Barker v. UBS AG*, 888 F. Supp. 2d 291, 298-300 (D. Conn. 2012).

Our client's termination, just two months after being awarded his full annual bonus and receiving a positive overall annual performance review from the General Counsel, was undoubtedly caused by his legally protected complaints initially raised in January.  Suspiciously, Mr. Solmssen summarily terminated Mr. Katzel just days before the arrival of AIG's new CEO, at a time when the Company's executives would typically avoid taking consequential actions, in order to give the Company's new leader the chance to form his own team and strategy.  The suspicions regarding Mr. Solmssen's motives and timing only deepen in light of numerous public announcements that the Company's new CEO intends to more aggressively grow AIG through strategic transactions, which would be evaluated under the very same illicit process, and by the same team, that Mr. Katzel called attention to in connection with Kalahari.  The unusual timing demonstrates that Solmssen's decision was driven at least in part by his desire to cover up his role in the abandonment of the Kalahari opportunity and to prevent Katzel from revealing legacy executive leadership's deep involvement in the Company's corrupt process for evaluating and pursuing material strategic transactions to the Company's new CEO.  The temporal proximity between our client's complaint and his termination, moreover, gives rise to a retaliation claim pursuant to the Acts; especially as no legitimate or credible reason, to date, has been given for such termination.

Our client's treatment at termination – being escorted from the building with access to his email and systems shut off without notice and the poor reference given to a member of the legal press – is consistent with and indicative of AIG's retaliatory motives and has been meaningfully damaging to his personal and professional reputation, his career prospects, and his earning potential.[6]

AIG's retaliatory termination of Katzel without any formal disciplinary write up at all – shortly following his reporting of legitimate concerns about the integrity of AIG's conduct in

---

[6] Moreover, AIG's retaliatory intent has been demonstrated repeatedly over the past 5 months since Mr. Katzel's illegal termination in numerous ways.  These include, without limitation, (i) Mr. Solmssen's confirmation to Mr. Katzel at the time of his termination that he presented no security risk to the Company, and that escorting Mr. Katzel from the Company's premises was unnecessary, (ii) Mr. Solmssen's agreement that allowing Mr. Katzel and the Company the opportunity to engage in coordinated communications to the marketplace regarding his employment status would be advantageous, and (iii) repeated efforts by representatives of the Company since Mr. Katzel's termination to damage his professional reputation among his business colleagues, which have resulted in tangible loss of a consulting opportunity valued at $250,000-$300,000 and the loss of professional references critical to Mr. Katzel's future professional opportunities.



THE
BOYD
LAW
GROUP,
PLLC

October 27, 2017
Page | 8

connection with the Kalahari carveout process, the UBS RFP, and AIG's governance of its evaluation of strategic transactions, constitutes a violation of the Sarbanes Oxley and Dodd-Frank whistleblower protection provisions.

The unprofessional manner in which he was treated, including, without limitation, challenges to his industry standing by AIG's Head of Employment Law to members of the press, and interference by the Company's representatives with Mr. Katzel's business prospects and professional relationships, inflicted further reputational damages recoverable and recognized by the law.

### V.        Conclusion

In light of the foregoing, we respectfully submit that AIG's termination of Mr. Katzel constitutes a clear violation of Sarbanes Oxley's and Dodd-Frank's whistleblower protections. It is our intention to pursue all permissible remedies on Mr. Katzel's behalf, including the filing of a civil action in federal district court. We welcome your inquiry and attention related to the above and herein.

Sincerely,

THE BOYD LAW GROUP, PLLC

*/s/ Patrick J. Boyd*
Patrick J. Boyd
Stephen M. Bourtin