## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AARON KATZEL,

             Plaintiff,

   -against-

AMERICAN INTERNATIONAL GROUP, INC.,

             Defendant.

No. 20-cv-07220 (AKH)

**DEFENDANT'S LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendant American International Group, Inc. ("AIG") respectfully submits this statement of facts as to which it contends there is no genuine issue to be tried. In addition, Defendant incorporates herein the further evidentiary support set forth in the July 15, 2022 Declaration of Antonio J. Perez-Marques (the "Perez-Marques Decl.") filed herewith, and the exhibits attached thereto.

## I. Katzel's Background

1. Plaintiff Aaron Katzel ("Katzel") obtained a Bachelor of Arts from Columbia University in 1994 and a Juris Doctor from the University of Pennsylvania Law School in 1997. (Ex. A[1] (Katzel Tr.) 9:8–21; Ex. B (Katzel CV).)

2. Katzel is a licensed attorney. (Ex. A (Katzel Tr.) 9:8.) After law school, Katzel worked at "two of the preeminent global law firms" that are among "the most respected firms in the area of securities law." (Ex. A (Katzel Tr.) 9:8–21, 347:17–348:6; Ex. B (Katzel CV).) He worked as an associate at Sullivan & Cromwell LLP between 1999 and 2000, during which time

---

[1] "Ex. __" refers to exhibits to the Perez-Marques Decl.

his practice focused "pretty much exclusively on securities transactions."  (Ex. B (Katzel CV);

Ex. A (Katzel Tr.) 347:10–16.)  Between 2000 and 2006, he worked as an associate at Willkie

Farr & Gallagher LLP.  (Ex. B (Katzel CV).)

3.      Katzel joined AIG in 2006.  Starting in 2011 through Katzel's termination from

AIG on May 4, 2017, Katzel was the head of AIG's Legal Operations Center (the "LOC"),

which was responsible for reducing or controlling AIG's external legal costs and spending,

among other functions, such as managing the rates and terms of external legal services providers.

(Ex. C (Katzel OSHA Tr.) 21:14–18; Ex. B (Katzel CV).)

4.      The LOC's "clients" or "customers" were various departments and other

functions within AIG, such as the corporate legal department or the property and casualty claims

group.  (Ex. C (Katzel OSHA Tr.) 31:24–32:15, 34:25–35:5.)

5.      While head of the LOC, Katzel reported to AIG's General Counsel, or Chief

Legal Officer, a position that was held by Thomas Russo until his retirement in October 2016.

(Ex. C (Katzel OSHA Tr.) 151:23–152:2, 152:21–153:3, 22:13–18; Ex. D (Solmssen OSHA Tr.)

10:2–3, 10:24–11:19.)  After Russo's retirement, AIG's new General Counsel, Peter Solmssen,

became Katzel's supervisor.  (Ex. C (Katzel OSHA Tr.) 12:15–21; Ex. D (Solmssen OSHA Tr.)

10:2–3, 10:24–11:19.)

6.      While working under Russo, Katzel considered Russo to be a "mentor" who

provided Katzel with "a lot of opportunity" and was "an active promoter of [Katzel's] career and

what [Katzel] thought the strategy of the Legal Operations Center should be."  (Ex. C (Katzel

OSHA Tr.) 152:6–12.)  In 2011, Russo and Katzel also co-authored a book together.[2]  (*Id.* at

---

[2] *See* Thomas A. Russo and Aaron J. Katzel, *The 2008 Financial Crisis and its Aftermath: Addressing the Next Debt Challenge* (2011).

153:4–10.)  Prior to being head of the LOC, Katzel served as Russo's chief of staff.  (*Id.* at

153:13–154:6.)

## II.  Project Kalahari

7.  During his leadership of the LOC, Katzel developed a business plan to carve out

the LOC into an independent, external-facing entity, called The Legal Operations Company

("TLOC") that would manage legal spend for other companies, in addition to AIG.  (Ex. C

(Katzel OSHA Tr.) 21:19–23, 23:21–24:24.)  Katzel expected to be the President and Chief

Executive Officer of TLOC and to receive equity in the new company if the carve out were

completed.  (Ex. B (Katzel CV); Ex. C (Katzel OSHA Tr.) 28:16–20, 164:16–21.)

8.  Starting in 2015, AIG began evaluating this plan to carve out the LOC.  (FAC[3]

¶ 5.)  AIG referred to its evaluation of the potential business as "Project Kalahari," and the goal

of Project Kalahari was to explore whether the LOC could be more valuable to AIG as an

independent entity with external investors and clients.  (Ex. A (Katzel Tr.) 18:16–25.)

9.  Beginning in or around May 2016, AIG's Corporate Development group was

tasked with leading Project Kalahari, and Konstanty Owczarek, a managing director of that

group, was assigned to the project.  (Ex. C (Katzel OSHA Tr.) 29:11–20; Ex. F (Owczarek

OSHA Tr.) 8:2–6, 55:22–56:2.)

## III.  Corporate Development Surveys the LOC's Internal Clients

10.  As part of its review of the potential carve out, the Corporate Development team

conducted a survey of some of the LOC's internal clients and interviewed those survey

participants.  (FAC ¶¶ 86–87; Ex. G.)  The purpose of the survey was to better understand "the

---

[3]"FAC" refers to Plaintiff's Amended Complaint at ECF No. 53, which is attached as Exhibit E to the Perez-
Marques Decl.

value proposition of [the] LOC and its services" by analyzing how the LOC's internal clients viewed the LOC. (Ex. H.) Katzel commented on the proposed survey participants before the survey was conducted. (Ex. I.)

11. The survey results revealed general dissatisfaction with "the overall quality of services provided by [the] LOC" and "the quality of [the] LOC's management team," among other issues. (Ex. G at RESPONDENT_0005929.) On a scale from "Poor" to "Excellent," the average survey response was "Below Average" for rating "the overall quality of the services provided by LOC," the "comprehensiveness of the services provided by LOC," "the quality of LOC's management team," and the "ease of use of using LOC's services." (Ex. G at RESPONDENT_0005929.) No one responded "Excellent" and only one person responded "Good" to any of these questions. (Ex. J at RESPONDENT_0014004–18.)

12. Corporate Development conducted interviews with the survey participants, and the interviews were summarized in memoranda. (*See* Ex. G at RESPONDENT_0005924–28.) The interview memoranda reflect that the participants had a "generally negative view of LOC" and numerous participants expressed the belief that LOC had too many employees. (Ex. F (Owczarek OSHA Tr.) 212:17–25; Ex. G at RESPONDENT_0005924–28.)

13. The Corporate Development team shared a summary of the survey results with Katzel. (Ex. C (Katzel OSHA Tr.) 64:7–14.)

14. By October 2016, Katzel had developed a concern that the survey results were inaccurate because "based on the discussions we've had with participants, there were in fact many positive views re: 'tremendous value delivered' by multiple participants which aren't reflected in the summary at all." (Ex. K; Ex. L.) Katzel relayed these concerns to Owczarek because Katzel was concerned that Project Kalahari was not "conducted in a way that would lead

AIG to be able to extract the best possible value out of the asset for the company and its shareholders." (Ex. C (Katzel OSHA Tr.) 48:24–49:11.)

15.     Katzel also developed a concern that the original copies of the survey responses were not adequately preserved in October 2016. (Ex. C (Katzel OSHA Tr.) 225:11–25; Ex. M.) Survey participants had marked their answers on a hard copy survey. (Ex. M; Ex. J at RESPONDENT_0014004–18.) The hard copy survey results were scanned and electronically saved. (Ex. J at RESPONDENT_0014004–18; Ex. C (Katzel OSHA Tr.) 84:21–85:5.) After the survey results were scanned, the original hard copies were shredded. (Ex. M.) Scans of the hard copy surveys were produced to Katzel during the OSHA proceeding. (*See* Ex. J at RESPONDENT_0014004–18.)

### A. Owczarek Consults with Accenture

16.     During his review of TLOC in September 2016, Owczarek had a call with a member of the consulting firm, Accenture, Kenneth Saldanha, to discuss an analysis Accenture had performed in March 2016 concerning ways to cut costs for the LOC (the "Accenture Analysis"). (Ex. N; Ex. O (Owczarek Tr.) 23:3–7; Ex. P.)

17.     Accenture was a "major vendor for [AIG] across multiple businesses." (Ex. F (Owczarek OSHA Tr.) 108:7–9). Accenture's relationship with AIG was formalized in a Professional Consulting Services Agreement. (Ex. Q.) That agreement required Accenture to keep, among other things, all information concerning AIG's "operations, affairs, products, marketing, systems, technology, customers, end-users, and business, including financial affairs," and information concerning AIG's "relations with their customers, employees, agents, and service providers" confidential. (*Id.* at 14.)

18.    The Accenture Analysis was commissioned by AIG's claims operations group, one of the LOC's internal clients, which was examining ways to cut costs for claims operations, including costs spent on the LOC. (Ex. R (Perera Tr.) 23:12–24:4, 30:5–31:6.)  In connection with that review, Lina Hu of AIG sent a document with file name "Legal Operations Center – GOE Walk" to Kenneth Saldanha and Nicholas Baldridge at Accenture on March 7, 2016.  (Ex. S.)  Owczarek did not provide any information about the LOC or TLOC to Accenture beyond what Hu had already provided to it.  (Ex. O (Owczarek Tr.) 23:8–14.)

19.    In September 2016, Owczarek told Katzel that he wanted to involve Accenture to "think through a cost model" for TLOC.  (Ex. T.)  At that time, Katzel was concerned by AIG's decision to share information with Accenture because he believed that Accenture might have a conflict of interest on account of his belief that "Accenture does procurement services and has done so for AIG previously" and might use the information to "poach employees / try to build the business off our work."  (Ex. T.)  Katzel asked Owczarek about Saldanha's background and Owczarek replied that Saldanha was a "[f]ormer McKinsey strategy consultant" who was not bidding to provide AIG "any services" and was not TLOC's "competitor at all."  (Ex. V.)  Katzel also disagreed with the Accenture Analysis, describing it as "phony" and a "low ball bid for the business and our IP," and wrote, on October 13, 2016:

> Accenture was involved from the beginning[,] and they put some numbers on a page to get to a result that benefits them.  It certainly looks to me like they were trying to influence the process behind the scenes.  I don't understand how we can include that result and still hope to have integrity in the process or result.

(Ex. Y.)

20.    After Katzel raised his concerns regarding the Accenture Analysis, Owczarek asked Hu whether AIG was considering outsourcing LOC's work to Accenture and she informed him that AIG was not.  (Ex. U; Ex. W.)  Katzel told Owczarek that Oliver Wyman, a consulting

firm that assisted in Project Kalahari (FAC ¶ 73), told him that AIG was considering outsourcing the LOC's work to Accenture, but when Owczarek asked Oliver Wyman for the source of that information, they told him it was based solely on statements from Katzel. (Ex. U; Ex. X; Ex. Y.)

## IV. The Executive Leadership Team Reviews Corporate Development's Findings and Ends Project Kalahari

21.     The Corporate Development team drafted a summary of its findings on Project Kalahari in October of 2016. (*See* Ex. Z at RESPONDENT_0009422.) The Corporate Development team reported that "[e]ffectively all of LOC's current clients within AIG do not attach high value to the full suite of products" and that the "LOC management proposal does not provide a meaningful cost reduction potential." (*Id.* at RESPONDENT_0009425.)

22.     Owczarek presented the Corporate Development team's findings to AIG's Executive Leadership Team ("ELT") along with other materials relevant to evaluating TLOC, including materials provided by Katzel. (Ex. Z; Ex. AA.)

23.     The ELT, including Solmssen, then decided to end Project Kalahari "[b]ased upon all of the facts presented," determining not to carve out the LOC. (Ex. BB; FAC ¶ 10.) Solmssen believed that AIG should end Project Kalahari because he believed, based on what he had seen at other companies, that the idea of carving out the LOC to provide services to third-party clients was "generally . . . a bad idea." (Ex. D (Solmssen OSHA Tr.) 134:20–135:5.) Solmssen also believed that AIG should end Project Kalahari because colleagues at AIG informed him that "LOC was not providing good services internally." (*Id.* at 135:6–16.) Specifically, Solmssen's colleagues told him that the LOC "is a disaster" and one member of his staff refused to use the LOC because the LOC was "so damaging to his relationships with important outside counsel" even though Russo ordered him to use the LOC. (*Id.* at 139:25–141:8.) Solmssen believed that it was "inconceivable that one could make a successful sale of

the company whose only customer hates it" and that "nothing good could come of" carving out the LOC.  (*Id.* at 134:20–135:16.)

## V.     Katzel Certifies That He Lacks Knowledge of Any Violation of Law, Regulation, or Policy

24.     Katzel "always sought to be truthful and candid" in "completing certifications requested by AIG."  (Ex. A (Katzel Tr.) 12:7–12.)  Katzel completed any such certifications "to the best of [his] knowledge and belief at the time."  (*Id.* at 12:22–13:9.)  Katzel acknowledged that it is fair for AIG to rely on his certifications as reflecting his genuine beliefs.  (*Id.* at 13:22–14:4.)

25.     AIG required "all [o]fficers and [e]mployees of AIG and its subsidiaries" to complete a 2016 AIG Code of Conduct Certification (the "Code of Conduct Certification") certifying, among other things, that they have read AIG's Code of Conduct and have complied with it.  (Ex. CC (2016 Cert.).)  Katzel completed the Code of Conduct Certification on November 28, 2016.  (Ex. DD (2016 Cert. Record); Ex. EE (Nelson Tr.) 230:23–231:11, 233:10–15.)  Question 4 of the Code of Conduct Certification asked, "Do you have any violations of the Code of Conduct, AIG policy, law or regulation to report?"  (Ex. CC (2016 Cert.).)  Katzel responded that he did not have any violations of the Code of Conduct, AIG policy, law or regulation to report.  (*Id.*)  Katzel agrees that Question 4 encompasses violations of any rule, or regulation of the Securities and Exchange Commission, violations of any provision of federal law relating to fraud against shareholders, mail fraud, wire fraud, bank fraud, and securities fraud.  (*Id.*; Ex. A (Katzel Tr.) 146:2–22.)

**VI.    Katzel Responds to AIG's Fraud Risk Assessment, Indicating He Is Unaware of Fraud**

26.    Each year, AIG performed an "Annual Fraud Risk Assessment . . . to satisfy various regulatory requirements at the State and Federal levels."  (Ex. FF.)  As part of the 2016 fraud risk assessment, Katzel was required to respond to a Corruption Risk Questionnaire.  (Ex. GG; Ex. FF.)  The Corruption Risk Questionnaire identified four categories of Corruption Risk: (1) Conflict of Interest, (2) Bribery, (3) Illegal Gratuities, and (4) Economic Extortion.  (Ex. FF.)  The Questionnaire contained two questions.  (*Id*.)  The first question asked whether, for the fraud categories of Corruption Risk, respondents had "any knowledge of any fraud perpetrated or alleged or suspected that could result in a material misstatement of AIG's financial statements."  (*Id*.)  The second question asked whether, for the fraud categories of Corruption Risk, respondents had "any knowledge of any fraud at AIG, perpetrated, alleged or suspected, regardless of materiality."  (*Id*.)

27.    Katzel received the Corruption Risk Questionnaire on November 3, 2016 and received reminders to complete it from Scott Horton ("Horton"), a member of AIG's Compliance Department, on November 14, 2016 and November 30, 2016.  (Ex. GG; Ex. EE (Nelson Tr.) 48:9–15.)

28.    Katzel met with Horton and Horton's supervisor, Marie McCormack ("McCormack") to discuss the Corruption Risk Questionnaire before filling it out.  (Ex. C (Katzel OSHA Tr.) 221:15–20; EE (Nelson Tr.) 48:9–15.)  Katzel raised three concerns at that meeting: (1) that "[t]he process with which the company pursued strategic transactions had serious gaps that meant that it could not be assured that those transactions were being pursued in a way that maximize[s] the value to the company," which was "highlighted by the behavior of Mr. Owczarek . . . throughout the Kalahari process" and by the fact that Corporate

Development's survey and "negotiations around the carve out" were "conducted in a highly suspicious way"; (2) "[t]hat the internal control environment surrounding preservation of business records was inadequate" because he believed that "the notes underlying [Corporate Development's] surveys have been destroyed"; and (3) that "[e]nforcement of the compliance policies of the company including how sensitive confidential information and business secrets were treated and compliance with antimonopoly policy" might be inadequate because AIG shared confidential information about LOC with Accenture, which Katzel believed was "looking to bid to provide services to AIG." (Ex. C (Katzel OSHA Tr.) 223:24–226:18.)

29.     After discussing with McCormack and Horton, Katzel responded to the Corruption Risk Questionnaire in a December 1, 2016 email to Horton. (Ex. GG.) In response to Question 1 of the Corruption Risk Questionnaire, Katzel stated that, "as discussed" with Horton, he did not have "any knowledge" of "any fraud perpetrated or alleged or suspected that could result in a material misstatement of AIG's financial statements" relating to the four categories of Corruption Risk. (*Id.*) In response to Question 2 in the Corruption Risk Questionnaire, Katzel stated that he "did not have any specific knowledge" of "any other fraud at AIG, perpetrated, alleged or suspected, regardless of materiality" relating to the four categories of Corruption Risk. (Ex. GG; Ex. FF.)

30.     In his December 1, 2016 email to Horton, Katzel also wrote:

> As we discussed, I also agree it would be worthwhile for you, me, Marie and Karen to evaluate the advisability of review and testing on the robustness of conflict of interest protections in the processes followed by certain functions responsible for significant transactions at the company. Such review and testing could provide additional comfort that the company consistently follows rigorous processes and procedures that support our ability to make and implement decisions that maximize shareholder value in such transactions.

(Ex. GG.)

31.     AIG's Compliance Department investigated Katzel's concerns.  (Ex. HH; Ex. EE (Nelson Tr.) 25:22–26:3, 149:10–22.)  AIG's Compliance Department was not responsible for investigating fraud.  (Ex. EE (Nelson Tr.) 99:7–18, 229:23–230:5.)  AIG's Investigations Group was responsible for investigating fraud.  (*Id.* at 99:7–18, 230:2–7.)

32.     The Compliance Department interviewed Katzel in connection with that investigation.  (Ex. II.)  Horton took handwritten notes of the interviews conducted as part of the investigation.  (Ex. JJ (McCormack Tr.) 108:23–110:23; *see* Ex. KK; Ex. KK.1.)  At his interview, Katzel told Horton that he was concerned that Accenture would use information about the LOC to "underbid in every case." (Ex. KK; Ex. KK.1.)  Katzel also told Horton that he believed that Corporate Development's survey included certain individuals "who were never actually customers" of LOC and that survey respondents had provided "positive feedback" that was "not reflected."  (*Id.*)  Katzel told Horton that there is a concern that the ELT may not be getting the best information for matters of transactions or strategy.  (*Id.*)  Katzel also told Horton that the survey results were shredded.  (*Id.*)

33.     Beyond interviewing Katzel, AIG's Compliance Department interviewed Hu; Hu's supervisor, Charith Perera; and Owczarek.  (Ex. R (Perera Tr.) 23:12–24:4; Ex. II; Ex. JJ (McCormack OSHA Tr.) 50:8–51:10.)  The Compliance Department also discussed Katzel's complaints with corporate compliance's privacy team and human resources.  (Ex. II.)  In addition, the Compliance Department reviewed various background emails and documents concerning Katzel's claims, including documents provided by Katzel.  (Ex. II; Ex. JJ (McCormack OSHA Tr.) 50:8–22; Ex. LL.)

34.     The Compliance Department completed its investigation in February 2017.  (Ex. II.)  The Compliance Department summarized its investigation's findings in talking points,

which were prepared in anticipation of a meeting with Solmssen. (Ex. EE (Nelson Tr.) 133:19–134:5, 188:22–189:6; *see also* Ex. II.) The talking points stated that Katzel raised complaints relating to ensuring that "the company consistently follows rigorous processes and procedures to support the decision-making process with respect to potential transactions." (Ex. II.)

35. The Compliance Department determined that "there was no merit to the issues" that Katzel raised. (Ex. EE (Nelson Tr.) 209:21–210:5.) The Compliance Department's review found "there was no indication of potential conflict of interest" with Accenture. (Ex. II.) While it did find that the claims operations group "arguably" did not follow the terms of the master agreement with Accenture by failing to execute a specific Statement of Work for Accenture's review of LOC and thus could have violated AIG's Global Information Handling Standards, which require "an appropriate written agreement," any risk relating to the sharing of information with Accenture "is mitigated by the fact that the Master Agreement with Accenture contains broad confidentiality and data security language requiring Accenture to safeguard the AIG Firm Confidential information." (*Id*.) With respect to corporate development's review of the LOC, the Compliance Department found that the surveys had been preserved and that there was "[n]othing unusual [was] found" with respect to the surveys. (*Id*.) The Compliance Department further determined that the "use of a manual survey process was reasonable under the circumstances and given the small scale." (*Id*.)

36. At the close of the investigation, Nelson discussed the Compliance Department's findings with Katzel, "thanked him for raising the issues and stated that a review was done and that there was no merit to the issues that he had raised." (Ex. EE (Nelson Tr.) 209:21–210:5; Ex. JJ (McCormack OSHA Tr.) 25:21–23, 157:6–11.)

37.     Katzel never indicated to anyone, including Solmssen, Owczarek, Nelson, McCormack, or Horton that he believed that any conduct he described in the course of the Compliance Department's investigation constituted fraud, bank fraud, wire fraud, securities fraud, a violation of SEC rules, a violation of federal law, or fraud against AIG's shareholders. (Ex. MM (Solmssen Tr.) 132:10–135:7; Ex. EE (Nelson Tr.) 228:3–229:22; Ex. O (Owczarek Tr.) 141:10–143:2; Exs. KK–KK.1 (Horton Notes); Ex. C (Katzel OSHA Tr.) 224:16–226:15; Ex. JJ (McCormack Tr.) 59:5–7.)  None of them understood Katzel to have raised concerns about fraud, bank fraud, wire fraud, securities fraud, a violation of SEC rules, a violation of federal law, or fraud against AIG's shareholders.  (*Id.*)

38.     Had AIG's Compliance Department understood Katzel to be raising concerns about fraud, his complaints would have been investigated by AIG's investigations group instead of the Compliance Department.  (Ex. EE (Nelson Tr.) 99:7–18, 229:23–230:7.)

39.     Throughout the Compliance Department's investigation Katzel continued to serve as head of the LOC as he had prior to the Kalahari process and compliance review.  (*See, e.g.*, Ex. B (Katzel CV).)  Katzel continued to serve as head of the LOC after the Compliance Department's investigation concluded in February 2017.  (*Id.*)

## VII.    Katzel's Termination

40.     Peter Solmssen gave Katzel a written year-end performance review for 2016 (the "2016 Review").  (Ex. D (Solmssen OSHA Tr.) 123:13–124:11; Ex. C (Katzel OSHA Tr.) 263:8–11; Ex. NN (Katzel 2016 Review).)  The 2016 Review was the only written performance review Solmssen gave Katzel.  (*Id.*)  The 2016 Review includes both Solmssen's review of Katzel and Katzel's self-assessment of his own performance.  (Ex. NN.)

41.     In the 2016 Review, Solmssen rated Katzel as "Fits Poorly" for "good at building

relationships," "open to new ways of doing things," and "respected by clients." (*Id*.)  Katzel's

self-review for the same period indicated "Fits Poorly" for "respected by clients." (*Id*.)  Further,

Katzel indicated that the "weakness/impact" of "respected by clients" for him was "severe."

(*Id.*)  Solmssen's 2016 Review's comments further stated "[t]he LOC is not providing its

customers with what they want and how they want it." (*Id.*)

42.     After the close of Project Kalahari, Solmssen wanted to make changes to the

LOC.  (Ex. C (Katzel OSHA Tr.) 150:9–11.)  At this time, one of Solmssen's goals for the LOC

was to cut costs and reduce its headcount.  (Ex. MM (Solmssen Tr.) 45:10–22; Ex. D (Solmssen

OSHA Tr.) 38:15–39:18; *see also* Ex. C (Katzel OSHA Tr.) 150:20–151:2.)  Solmssen's 2017

plan for his role at AIG included the goal to shrink the LOC.  (Ex. OO.)

43.     In early 2017, Solmssen asked Katzel to put together a proposal to revise the

LOC, including through headcount reductions.  (Ex. MM (Solmssen Tr.) 44:19–45:22.)  In

March 2017, Katzel delivered materials to Solmssen concerning "LOC service enhancement

opportunities."  (Ex. PP.)  These materials "did not respond to [Solmssen's] request or

suggestion or direction."  (Ex. D (Solmssen OSHA Tr.) 94:3–96:11.)  Solmssen believed that

these materials "were entirely useless."  Ex. MM (Solmssen Tr. 44:4–14).)  Solmssen told Katzel

that the materials were not what he had asked for.  (Ex. PP; Ex. D (Solmssen OSHA Tr.) 96:9–

11.)  Solmssen told Katzel that Katzel had suggested that the project would take a week but

"[i]t's been longer."  (Ex. PP.)  Solmssen told Katzel "If you aren't going to do this, you know,

other people will."  (Ex. C (Katzel OSHA Tr.) 149:15–17.)

44.     In April 2017, one AIG employee expressed to Solmssen's chief of staff, Victoria

Bozovic, that:

> [Katzel] is not willing to work with us to progress Peter's request
> on the LOC . . . [M]y team face[s] constant condescending
> remarks, arguments about facts that we have had face-to-face
> meetings to discuss, and constant push back on committed requests
> and time frames. This attitude is furthest from professional and is
> becoming a hindrance to us progressing the review. We need steer
> from Peter . . . on Aaron's engagement. It has never been
> constructive but now it is frankly becoming quite tiring."

(Ex. QQ.) Also in April 2017, one of the LOC's internal clients indicated to Solmssen that he was "skeptical that" a proposed plan to reform the LOC "can be effectively implemented by current LOC management." (Ex. RR.)

45.     On May 4, 2017, Solmssen terminated Katzel. (FAC ¶ 177; Ex. TT.) Solmssen decided to terminate Katzel because Solmssen believed that Katzel "was neither willing nor able . . . to make the changes that were necessary to the LOC to make it valuable or useful to AIG." (Ex. D (Solmssen OSHA Tr.) 129:8–14.) Solmssen believed that Katzel had failed to follow his request to "[m]ake [LOC] leaner and make it effective." (Ex. D (Solmssen OSHA Tr.) 123:13–124:11.) Solmssen believed that "[Katzel] was incapable of doing what it was the company needed him to do." (*Id.* at 131:8–16.) Solmssen also believed that Katzel was not "the right person to lead the LOC going forward" and "simply either didn't—wouldn't or couldn't" make the requested changes to LOC. (Ex. MM (Solmssen Tr.) 148:2–10.) Solmssen testified that Katzel's complaints months earlier played no role in his decision. (Ex. D (Solmssen OSHA Tr.) 133:7–10; Ex. MM (Solmssen Tr.) 148:11–15.)

46.     Solmssen invited Katzel to return to AIG on the Monday following his termination to work through the transition. (Ex. C (Katzel OSHA Tr.) 284:8–285:10.) Katzel accepted Solmssen's invitation and returned to AIG and addressed his team. (*Id.* at 286:21–

287:2.)  Solmssen also permitted Katzel to take contact information for his professional network. (*Id.* at 288:15–289:18.)

47.     After Katzel returned to the office the following Monday he lost access to AIG systems including email, telephone access, mobile phone access, and network access.  (*Id.* at 284:20–25, 286:21–289:13.)  That same Monday, a "representative from HR" came and told him that he "needed to leave."  (*Id.* at 285:25–286:3.)

48.     It was common practice at AIG for employees who had been terminated to have to leave the building without a transition period.  (Ex. SS (Hurd Tr.) 26:20–27:11; Ex. D (Solmssen OSHA Tr.) 127:13–128:5; Ex TT).

49.     Before Katzel was terminated, Solmssen discussed Katzel's termination with AIG's Human Resources function and Human Resources drafted talking points for Solmssen based on that discussion.  (Ex. D (Solmssen OSHA Tr.) at 126:13–128:5; *see* Ex. TT.)  The talking points state that Katzel was being terminated as part of changes that AIG was making to the LOC.  (Ex. TT.)

50.     Senior leaders at AIG indicated to Solmssen that "this was long overdue" and that under Katzel's leadership, the LOC was "a disaster."  (Ex. D (Solmssen OSHA Tr.) 130:4–15, 141:7–8.)

51.     The AIG employees who were "principally involved in the decision to terminate Katzel's employment" were Annette Bernstein, Bozovic, Rose Marie Glazer, Eric Kobrick, Michael Leahy, and Solmssen.  (Ex. UU (AIG Rog. Resp.) No. 1.)

## VIII.   Katzel's LTIP Compensation

52.     Each year, certain AIG employees, including Katzel, received long term incentive compensation "LTIP Compensation."  (FAC ¶ 200.)  Katzel's LTIP Compensation was governed

by a contract called the Long Term Incentive Plan ("LTIP"). LTIP Compensation awarded between 2013 and 2016 was governed by the 2013 Long Term Incentive Plan ("2013 LTIP") and LTIP Compensation awarded in 2017 was governed by the Long Term Incentive Plan (2017 Awards or Later) ("2017 LTIP"). (Ex. VV (2013 LTIP); Ex. WW (2017 LTIP).)

53.    LTIP Compensation was a grant of stock that Katzel would be awarded for a given year. (*Id.*) The LTIP Compensation would not be delivered to Katzel when it was awarded. (*Id.*) The LTIP Compensation would be delivered to Katzel after a set number of years if AIG met certain performance metrics. (*Id.*)

## IX.    Katzel Fails To Accept His 2017 LTIP Award

54.    AIG's issuance of particular grants of equity compensation to employees would be governed by separate "Award Agreements" for each particular issuance of equity. Ex. VV (2013 LTIP) (Section 3.D); Ex. WW (2017 LTIP) (Section 3.D).) Both the 2013 LTIP and 2017 LTIP give AIG the right to rescind a plan participant's LTIP Compensation unless they accepted the applicable Award Agreement. (Ex. VV (2013 LTIP) at Section 3(D); Ex. WW (2017 LTIP) at Section 3(D).) Section 3(D) of the 2013 LTIP states:

> By accepting an Award pursuant to this Plan, a Participant thereby agrees that the Award shall be subject to all of the terms and provisions of this Plan, the SIP and the applicable award agreement. Awards shall be accepted by a Participant signing the applicable award agreement, and returning it to the Company. Failure by a Participant to do so within 90 days from the date of the award agreement shall give the Company the right to rescind the Award.

(Ex. VV (2013 LTIP).) Section 4(D) of the 2017 LTIP states:

> By accepting an Award pursuant to this Plan, a Participant thereby agrees that the Award shall be subject to all of the terms and provisions of this Plan, the Omnibus Plan and the applicable award agreement. Awards shall be accepted by a Participant signing the

applicable award agreement, and returning it to the Company. Failure by a Participant to do so within 90 days from the date of the award agreement shall give the Company the right to rescind the Award.

(Ex. WW (2017 LTIP).)

55.     Katzel understood that he needed to enter an Award Agreement to receive his LTIP Compensation for a given year.  (Ex. A (Katzel Tr.) 209:19–23.)  Katzel entered into an Award Agreement prior to receiving his LTIP Compensation each year between 2013 and 2016.  (Ex. A (Katzel Tr.) 209:24–210:3.)

56.     For the LTIP Compensation scheduled to be awarded to Katzel in May 2017, AIG repeatedly informed Katzel that, if he did not accept the Award Agreements, he would not receive his 2017 LTIP Compensation, including that the "award will be cancelled."  (Ex. XX; Ex. YY; Ex. ZZ; Ex. AAA.)  At that time, Katzel understood that the LTIP provided that if he did not execute the Award Agreements he would not receive his LTIP Compensation.  (Ex. A (Katzel Tr.) 210:12–22.)  Katzel never executed an Award Agreement for his 2017 LTIP Compensation.  (*Id.* at 210:4–7.)

57.     The Award Agreements for Katzel's 2017 LTIP Compensation do not contain a provision releasing claims against AIG.  (Ex. BBB.)  The Award Agreements for Katzel's 2017 LTIP Compensation do not contain a provision requiring Katzel to affirm that he has no knowledge of fraud or other violations committed by AIG.  (*Id.*)  The Award Agreements for Katzel's 2017 LTIP Compensation state: "Nothing herein shall prevent you from making or publishing any truthful statement (a) when required by law, subpoena, or court order, (b) in the course of any legal, arbitral or regulatory proceeding, (c) to any governmental authority, regulatory agency or self-regulatory organization, or (d) in connection with any investigation by the Company."  (*Id.*)

**X. Katzel Declines To Execute a Release of Claims Against AIG**

58. Pursuant to the terms of both the 2013 LTIP and the 2017 LTIP, terminated employees were not entitled to any LTIP compensation that had been awarded but had not yet vested and paid out prior to their termination.  (Ex. VV (2013 LTIP) (noting in Section 6.A that "if a Participant's Employment is Terminated for any reason, then any unvested Awards, or parts thereof, shall immediately terminate and be forfeited"); Ex. WW (2017 LTIP) (same).) However, both contracts also allow an employee who is terminated without cause to receive any LTIP compensation that had been previously awarded but not yet vested prior to their termination if, "as a condition to receiving delivery of any Shares (or cash) under any Awards following such" termination, such employee "execute[s] a release substantially in the form attached as Annex B" to the applicable LTIP."   (Ex. VV (2013 LTIP) (Section 6.G); Ex. WW (2017 LTIP) (Section 6.G); Ex. DDD (Plf. RFA Resp.) No. 5.)

59. Upon his termination, AIG presented Katzel with a release (the "Release").  (Ex. CCC (Release); Ex. A (Katzel Tr.) 190:24–191:10.)  The document produced at COMPLAINANT 002159–60 is a true and correct copy of the Release.  (Ex. A (Katzel Tr.) 191:5–10; *see* Ex. CCC (Release).)  The Release does not include a provision requiring Katzel to affirm that he has no knowledge of fraud or other violations committed by AIG.  (Ex. CCC (Release).)  The Release also states that "Nothing herein shall prevent me from making or publishing any truthful statement (a) when required by law, subpoena or court order, (b) in the course of any legal, arbitral or regulatory proceeding, (c) to any government authority, regulatory agency or self-regulatory organization, or (d) in connection with any investigation by the AIG Group."  (*Id.*)

60. Katzel "refused to sign the Release Agreement that AIG presented to him." (Ex. DDD (Plf. RFA Resp.) Nos. 5–6.) Katzel did not receive any LTIP Compensation that was awarded before his termination but was due to be paid after his termination. (FAC ¶ 232–33.)

## XI. Katzel's Alleged Agreement with UBS

61. Katzel's unpaid LTIP Compensation was reflected in an account managed by AIG's third-party administrator of its LTIP Compensation awards, UBS (the "UBS Account"). (FAC ¶ 201.)

62. Katzel sent UBS a Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (the "UBS Subpoena"). (Ex. EEE.) The UBS Subpoena called for UBS to produce, among other things, documents relating to Katzel's UBS account. (*Id*.) UBS produced 1,124 pages of documents in response to the UBS Subpoena. (Perez-Marques Decl. ¶ 60.)

63. The documents UBS produced in response to the UBS Subpoena did not include any contracts between Katzel and UBS relating to the UBS Account, and no other party has produced such a contract. (Ex. A (Katzel Tr.) 254:3–6.) Katzel is unaware of whether there is a contract between him and UBS relating to the UBS Account and, if such a contract exists, who the parties to that contract are, what its terms are, and whether it is written. (Ex. A (Katzel Tr.) 254:7–20, 255:25–256:5.) Any understanding Katzel has of such a contract is based on speculation. (Ex. A (Katzel Tr.) 254:7–15).) If such an agreement exists, Katzel is unaware of whether UBS breached it. (*Id.* at 259:20–24.) The AIG employees who were "principally involved in discussions relating to Katzel's forfeiture of his" LTIP Compensation were Annette Bernstein, Sara Brown, Jo-Ann Gomez, Michael Leahy, Terri Kuhr, and Russell Lippman. (Ex. UU (AIG Rog. Resp.) No. 1).)

## XII.    Reporting to the SEC

64.    Katzel's counsel submitted a copy of Katzel's complaint in this action to the Securities and Exchange Commission ("SEC") on or about September 18, 2020 by mailing the complaint to the SEC under cover of a Form TCR.  (Ex. FFF (Plf. Rog. Resp.) No. 13); Ex. A (Katzel Tr.) 171:8–18.)  All retaliation Katzel alleges in the Complaint occurred prior to that date.  (Ex. A (Katzel Tr.) 177:15–20.)  Neither Katzel nor his counsel have submitted any other allegations concerning AIG to the SEC by mailing or faxing a form TCR to the SEC Office of the Whistleblower or through the SEC's website.  (Ex. FFF (Plf. Rog. Resp.) No. 13); Ex. A (Katzel Tr.) 163:24–165:8.)

65.    Prior to filing the complaint in this action, Katzel filed a complaint with the Occupational Safety and Health Administration ("OSHA") on October 27, 2017 (the "OSHA Complaint").  (*See* Ex. III.)  Neither Katzel nor his counsel submitted the OSHA Complaint to the SEC through the SEC's website or by mailing or faxing a form TCR to the SEC Office of the Whistleblower.  (Ex. FFF (Plf. Rog. Resp.) No. 13; Ex. A (Katzel Tr.) 164:24–165:8; Ex. C (Katzel OSHA Tr.) 299:14–300:4).)

## XIII.    Katzel's Interrogatory Responses

66.    AIG served Katzel with an interrogatory on July 9, 2021 asking him to "Identify with specificity all federal laws and regulations that allegedly You reasonably believed AIG's conduct had violated when, as alleged in the Complaint, You engaged in activity protected by 18 U.S.C. § 1514A."  (Ex. GGG (AIG Rog.) No. 11.)  On August 16, 2021, Katzel responded to AIG's interrogatory and stated that he believed AIG violated 18 U.S.C. §§ 1348 and 1349.  (Ex. FFF (Plf. Rog. Resp.) No. 11.)

67. On November 1, 2021, Katzel served a "supplemental response" to AIG's interrogatory and stated that he believed AIG violated Securities Exchange Act § 13(b)(2)(B); Securities Exchange Act Rules 13a-15(a), 13a-15(c), 13a-15(d), and 15d-15(c); and Securities Exchange Act Rule 13(b)(2). (Ex. HHH (Plf. Supp. Rog. Resp.) No. 11.)

## XIV. Procedural History

68. In the OSHA Complaint, Katzel alleged that he raised concerns to AIG's Compliance Department concerning the Kalahari process, which he claimed cost AIG an "opportunity to generate significant revenue and shareholder value." (Ex. III.) On February 27—two business days before trial was set to begin before the Administrative Law Judge— Katzel withdrew his claims before OSHA and, on September 3, 2020, filed the instant action. (FAC ¶ 29.)

Dated: New York, New York.                    Respectfully submitted,
       July 15, 2022

                                              By: __/s/ Antonio J. Perez-Marques_____
                                                  Antonio J. Perez-Marques
                                                  Angela T. Burgess
                                                  Gina Cora

                                              Davis Polk & Wardwell LLP
                                              450 Lexington Avenue
                                              New York, New York 10017
                                              (212) 450-4000
                                              antonio.perez@davispolk.com

                                              *Attorneys for Defendant American International Group, Inc.*