UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

AARON KATZEL,

                Plaintiff,

-against-

AMERICAN INTERNATIONAL GROUP, INC.,

                Defendant.

-----------------------------------------------------------X

**Case No. 20-cv-07220 (AKH)**

**PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S COUNTER STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern District of New York, Plaintiff Aaron Katzel ("Katzel" or "Plaintiff") respectfully submits this Response to the Rule 56.1 Statement of Defendant American International Group, Inc. ("AIG" and "Defendant"), and his own Rule 56.1 Counter-Statement of Facts as to which he contends there is no genuine issue to be tried.  In addition, Plaintiff incorporates herein by specific cited reference the further evidentiary support set forth in the September  19, 2022 Declaration of Aaron Katzel ("Katzel Decl.") and the September 19, 2022 Declaration of Neal Brickman ("Brickman Decl.") filed herewith, and the exhibits attached thereto.

References to section titles and paragraph numbers are to Defendant's Rule 56.1 Statement ("AIG's Statement") for purposes of convenience only, and do not constitute admissions or representations on behalf of Plaintiff for any purpose.  Capitalized terms not defined herein have the definitions assigned to them in AIG's Statement.

I.    Katzel's Background

1.    Katzel admits the statements contained in Paragraphs 1 and 2 of AIG's Statement, but observes that Paragraph 2 of AIG's Statement is incomplete in that it fails to set forth that Katzel's legal practice between 2000 and 2006 principally focused on mergers and acquisitions and restructuring transactions. (Katzel Decl. ¶1).

2.    Katzel admits the statements contained in Paragraph 3 of AIG's Statement, but notes that the statements are incomplete in that they fail to set forth that:

a.    Katzel's roles as in-house counsel at AIG between 2006 and 2011 principally focused on general corporate and commercial law, commercial and consumer finance, disputes, mergers and acquisitions and compliance matters (Katzel Decl. ¶1);

b.    Katzel was promoted four times during his employment at AIG (Brickman Decl. Ex.1, Katzel Limited Employment Records (Bates - AIG-5602-5);

c.    in every year of his tenure, Katzel's four separate supervisors at AIG rated his job performance at the level, or superior to that, of his peer group. (Brickman Decl. Exhibit 2 (Katzel's Annual Reviews -- Bates R-0019014-0019128);

d.    in every year of his tenure at AIG, Katzel was awarded increases to his overall compensation package (Brickman Decl. Ex. 1); Katzel Decl. ¶5);

e.    under Katzel's leadership the LOC was responsible not only for "reducing or controlling AIG's external legal costs and spending," but also for: (i) creating and managing AIG's legal data and analytics infrastructure; (ii) building and maintaining

AIG's legal technology infrastructure; (iii) establishing and managing all aspects of the economic and contractual relationships for the more than 1500 law firm offices and non-firm legal services providers that AIG and its insurance claims department worked with globally; and (iv) leading the legal department's operational process efficiency and automation programs. (Brickman Decl. Ex. 3 at Bates AIG-0001168);

      f.      while leading the LOC, numerous external industry awards recognized Katzel's positive contributions to AIG's legal department, including through (i) the Association of Corporate Counsel naming AIG a Value Champion, due to the initiatives led by the LOC to competitively manage the costs, rates and terms of AIG's outside counsel; (ii) Corporate Counsel Magazine recognizing AIG in 2014 as having the country's best in-house legal department, in part due to Katzel's contributions as leader of LOC; and (iii) being honored in 2013 by the New York Law Journal as an important contributor to the Overall Outstanding Legal Department of the Year. (Brickman Decl. Ex. 4 at Bates AIG-0002780-0002781; Brickman Decl. Ex. 5, Owczarek OSHA Deposition pp.49:25-50:8); and

      g.      AIG acknowledged that under Katzel's leadership the LOC was responsible for saving AIG hundreds of millions of dollars in legal costs. (Brickman Decl. Ex, 6, 11);

3.      Katzel admits the statement contained in Paragraph 4 of AIG's Statement, but observes that it is incomplete in that it fails to describe

      a.      all of the AIG departments that used the LOC's services during Katzel's leadership of the function, (Brickman Decl. Ex. 7 (R-18850-77); and

b.       their respective level of usage of the LOC's services. (Brickman Decl. Ex. 5, p.164:2-19; Brickman Decl. Ex. 7).

4.       Katzel admits the statements contained in Paragraphs 5 and 6 of AIG's Statement, but notes that the statements are incomplete in failing to set forth that, while serving as Head of the LOC, Katzel also had a matrix reporting relationship with various leaders of AIG's Claims Department, including, at various times, Head of Claims, Eric Martinez, Head of Claims Operations, Jane Tutoki, and Head of Claims Operations, Charith "Chaz" Perera. (Brickman Decl. Ex. 8, Perera Deposition p. 33:21-25).

II.    Project Kalahari

5.       Katzel admits the statements contained in Paragraphs 7 and 8 of AIG's Statement, but observes that the statements are incomplete and misleading in that they fail to acknowledge that

a.       development of the TLOC business plan commenced only after the LOC, under Katzel's leadership, had for three years met or exceeded the goals set for it by AIG senior leadership, including Chief Legal Officer Tom Russo, after consultation with members of AIG's Executive leadership and Claims, Global Legal Compliance and Regulatory teams; Brickman Decl. Ex. 9 at Bates R-0006720; Brickman Decl. Ex. 10 at Bates OW-00300, 00302);

b.       TLOC's business contemplated delivery of services in addition to managing other companies' legal spend, including delivery of advanced legal analytics based in part on the significant volume of legal and operational marketplace data collected and

maintained by the LOC under Katzel's leadership; [Brickman Decl. Ex 9; Brickman Decl. Ex. 11, Oliver Wyman's September 2, 2015 Project Kalahari Review (Bates OW-00894-00927, at 00925);

     c.    after receipt and consideration of extensive briefing thereon, AIG executive leadership had approved the development and launch of the TLOC business, and provided significant support for the carve-out of TLOC as a stand-alone business with external investors, through the following activities:

     i.    Katzel's direct manager, AIG's Chief Legal Officer Tom Russo, oversaw and supported the development of the business plan for TLOC pursuant to an initiative supporting the strategy of AIG's then-Chief Executive Officer, Peter Hancock, to develop innovative new non-insurance businesses within AIG as a means of increasing the company's profitability and reducing its insurance related risk; (Brickman Decl. Ex.12, A. Katzel OSHA Deposition p. 22:2-23; Brickman Ex. 13, Sid Sankaran Deposition p. 138:16-21; 177:25-178:2);

     ii.    in connection with that initiative, Russo and the Executive Leadership Team approved $14,000,000 in the 2016 budget for the LOC to engage outside expert support for the development of the TLOC business plan and subsequent operations, part of which was used to retain outside consultant Oliver Wyman, which dedicated external expert resources to support the development and validation of the business plan; (Brickman Decl. Ex. 14, Excerpts from Exhibits 1A and 1B - Sankaran Deposition);

iii.    in addition to Oliver Wyman's support, the TLOC business plan was developed through contributions from other members of the LOC team, and in consultation with the LOC's internal AIG users, including representatives of the Claims, Claims Operations, and Global Legal Regulatory and Compliance teams; (Brickman Decl. Ex 15, Excerpts from Oliver Wyman's March 30, 2015 Project Kalihari Market Validation (OW-266,268-70);

iv.    in connection with its support of the development of the TLOC business plan, Oliver Wyman conducted extensive market analysis, and concluded in a presentation delivered to AIG executive leadership that the TLOC business had a potential equity value of over $700 million; Brickman Decl. Ex. 11);

v.    the TLOC business plan was reviewed by, among others, Chief Legal Officer Tom Russo, Head of Claims Eric Martinez, and Head of Claims Operations Chaz Perera, and pursuit of the TLOC carve out was approved as part of AIG's 2016 budgeting process, and reconfirmed after Corporate Development's completion of diligence and delivery of a recommendation to AIG's Executive Leadership in early August, 2016 (Brickman Decl. Ex. 9; Brickman Decl. Ex. 14; Brickman Decl. Ex. 16 (Bates R-8470-3; Hurd "20");

vi.    Katzel was authorized by General Counsel Tom Russo to distribute, and did, in fact, distribute, "pitch decks" providing an overview of (i) TLOC's business plan and operating model, and projected financials, to potential investors, and (ii) TLOC's services to more than 40 potential external clients, many of which were referrals from members of AIG executive leadership and/or a team under

Chief Financial Officer Sid Sankaran which was working to develop "cross selling" opportunities to external parties with whom AIG had significant business relationships; (Brickman Decl. Ex. 4; Brickman Decl. Ex. 13, pp. 127:25 – 128:8);

      d.      after conducting an extensive due diligence review, a group of experienced potential external investors provided a written letter indicating their interest in investing in TLOC to AIG executive leadership, and held discussions with AIG Chief Legal Officer Tom Russo and AIG Chief Financial Officer Sid Sankaran regarding their potential investment in TLOC (Brickman Decl. Ex. 17 (Bates R-0005378-5383; Neches "13"); Brickman Decl. Ex. 18 (Bates R-0008419; Loeb Letter):

      e.      pursuant to the implementation of the carve-out process, AIG executive leadership authorized engagement of external counsel Norton Rose Fulbright LLP to represent TLOC and its proposed management team, on the one hand, and Kramer Levin Naftalis & Frankel LLP to represent AIG as a shareholder, potential investor, and potential customer, on the other, in the negotiation of the terms of a carve-out transaction and arm's length agreement. (Katzel Decl. ¶6); and

      f.      Head of Claims Operations Chaz Perera indicated in his "Playbook" presentation for 2016 that the carve out transaction with TLOC as an independent company providing services to third-party users was going to be "launched in 2016." (Brickman Decl. Ex. 3; Brickman Decl. Ex. 6).

6.      Katzel denies the statements contained in Paragraph 9 of AIG's Statement. AIG's Corporate Development group was not tasked with leading Project Kalahari, which. Katzel had been authorized and directed to lead by his manager, Chief Legal Officer Tom Russo, several

months prior to the Corporate Development team's involvement in the process. Rather, based on information and belief, beginning in June 2016 Corporate Development's representative Konstanty Owczarek ("Owczarek") was formally tasked with:

a. conducting a process to objectively determine and validate the value of TLOC to AIG; ensuring that the analysis was comprehensive, conformed with AIG standards, and was clearly presented for AIG senior management's review and approval; (Brickman Decl. Ex. 19, excerpts from Strategic Transactions Policy and Procedures of American International Group, Inc. (Bates Respondent-0019161, 0019167-8)); and

b. based on that evaluation, organize a best in class process to ensure that AIG as a shareholder, customer, and potential investor could maximize the value of its interest in TLOC through the negotiation of the terms of appropriate arm's length agreements between AIG and TLOC pursuant to which (i) TLOC would be carved out from AIG as a stand-alone company; (ii) AIG would invest in TLOC alongside new external investors to provide TLOC with initial capital to support its new, external business; and (iii) TLOC would continue to perform for AIG on a contractual basis the legal operations services that the LOC had performed for it prior to the carve-out. By the time that the Corporate Development team became involved in Project Kalihari, AIG was already soliciting outside investment in the carved-out entity. (Brickman Decl. Ex. 4; Brickman Decl. Ex. 19; Brickman Decl. Ex. 20 (Bates R-0001692-3, Neches "4"); Brickman Decl. Ex. 21 (Bates R-0001717-9)).

7. Although formally charged with conducting a process to objectively determine the value of TLOC to AIG, in violation of AIG's policies and internal controls, Owczarek conspired

with members of AIG senior management to produce a fraudulent analysis, as a means of deceiving AIG's executive leadership into canceling Project Kalahari, thereby eliminating a valuable asset and business opportunity of AIG. The Corporate Development team leveraged this fraudulent analysis to undermine AIG's ability to obtain value from its TLOC asset by interfering with its ability to provide services to third party customers, or obtain capital from external investors. AIG's statement fails to identify the other members of AIG's Corporate Development team who were involved in this effort (including former Head of Corporate Development Alon Neches, to whom Owczarek reported), and that the Corporate Development team reported to Chief Financial Officer Sid Sankaran. In addition to overseeing the effort conducted by the Corporate Development team to determine the value of TLOC to AIG, Chief Financial Officer Sankaran participated in the Executive Leadership Team's ultimate decision to terminate Project Kalahari, and was responsible under applicable U.S. securities laws and regulations for maintaining AIG's system of internal controls over financial reporting. AIG's Statement also fails to note that, after creating and delivering the fraudulent analysis regarding the Project Kalahari opportunity to AIG's Executive Leadership, Owczarek was promoted and made responsible for negotiating, on behalf of AIG, the terms of the pending spin-off of AIG's life and retirement business unit, a series of transactions with numerous material implications for AIG and its shareholders. (Brickman Decl. Ex. 5, Owczarek OSHA Dep., pp. 38:14-25; 41:2-8; 175:24-176:15 187:9-18; Brickman Decl. Ex. 22, Owczarek Dep., pp. 7:3-25; 34:10-38:6; 46:14-48:16; 57:23-58:3; 120:21-121:23; Brickman Decl. Ex. 14, Sankaran Dep., pp. 20:13-21:14; 39:16-40:18; Brickman Decl. Ex. 23 (Bates R-003542-67, Hurd "26"); Brickman Decl. Ex. 24 (Bates 0005914); Brickman Decl. Ex. 25 (Bates R-0006755-7, Perera "24"); Brickman Decl. Ex. 26 (Bates R-0002140-6, Perera "14").

III.    Corporate Development Surveys the LOC's Internal Clients

8.      Katzel admits the statement in Paragraph 10 that "…the Corporate Development team conducted a survey of some of the LOC's internal clients and interviewed those survey participants," but denies the remainder of Paragraph 10, including that the "…purpose of the survey was to better understand 'the value proposition of [the] LOC and its services… .'" AIG's Statement fails to note that Owczarek and others at AIG exploited AIG's lack of internal controls in its process for evaluating strategic transactions and intentionally designed the survey to lend credibility to their fraudulent report on TLOC for Executive Leadership.  The Statement further fails to note that the survey was created and conducted absent any recognized methodology, was intentionally populated with negative leading questions, was never validated, and was directed to a cherry-picked audience who lacked a basis for providing informed answers to the questions posed, all in order to elicit a pre-ordained response sought by the Corporate Development team. To wit, Owczarek and the Corporate Development team intentionally included as survey participants of multiple individuals in AIG who had no direct experience as users of the LOC's services in order to fraudulently influence the results. (Brickman Decl. Ex. 27 (Bates R-00017944, Neches "23); Brickman Decl. Ex. 28 (Bates R-4911-7); Brickman Decl. 29 (Bates R-2991); Brickman Decl. Ex. 5, Owczarek OSHA Dep., p. 214:18-21; 216:23- 17:6; Brickman Decl. Ex. 24; Brickman Decl. Ex. 8, Perera Dep., p. 161:11-162:16; Brickman Decl. Ex. 12, Katzel OSHA Dep., p. 309:9-310:4).

9.      Katzel lacks knowledge or information sufficient to admit or deny the truth of the statements contained in Paragraphs 11, 12 and 13 of AIG's Statement.  However, Katzel states that none of the facts asserted by AIG in these Paragraphs are material, as AIG's Statement fails to note that:

a.      AIG's Chief Legal Officer at the time of the termination of Project Kalahari
– Peter Solmssen ("Solmssen") – acknowledged that he never reviewed the surveys or any
of the memoranda summarizing the surveys and that those surveys played no role in
Solmssen's decision to terminate Project Kalahari  (Brickman Decl. Ex. 30, Solmssen Dep.,
pp. 76:5-18; 80:14-18; 131:19-132:9; Brickman Decl. Ex. 31, Solmssen OSHA Dep., pp.
28:15-19; 137:9-13; 141:4-6; 146:11-13);

b.      in connection with the support from the U.S. Treasury and Federal Reserve
Bank of NY that it received after the 2008 financial crisis, AIG had adopted written policies
governing decisions regarding strategic transactions as part of the reform of its internal
control and corporate governance environment required thereunder (Brickman Decl. Ex.
19; Brickman Decl. Ex. 32, Neches Dep., p.. 53:7-12);

c.      these policies served as AIG's internal controls to ensure that, when
pursuing strategic transactions, the company followed a rigorous, objective process in order
to act in its shareholders' best interest by appropriately identifying transaction related risks
and maximizing shareholder value (Brickman Decl. Ex. 22, Owczarek Deposition, pp.
43:22-44:7; Brickman Decl. Ex. 12, Katzel OSHA Deposition pp.306:13-307:10);

d.      notwithstanding the written policy adopted by AIG in connection with its
support and oversight by the U.S. Treasury and the Federal Reserve Bank of New York to
clarify authority at AIG on decisions regarding strategic transactions after the 2008
Financial Crisis, Solmssen stated that while at AIG he, acting unilaterally, had authority to
terminate, and did make the decision to terminate, Project Kalahari (Brickman Decl. Ex.

22, Owczarek Dep., p. 13:14-25; Brickman Decl. Ex. 30, Solmssen Dep., p. 80:14-18; Brickman Decl. Ex. 31, Solmssen OSHA Dep., pp. 145:23-146:12);

e. in conspiring with other members of AIG management to create a fraudulent analysis of the Kalahari opportunity, with the intent to preclude the carveout and deprive AIG and its shareholders of a business opportunity the company's outside advisors estimated as having an equity value of $700-800 million, Neches and Owczarek violated the requirements of AIG's written policy on strategic transactions they were charged with enforcing (Brickman Decl. Ex. 19; Brickman Decl. Ex. 22, Owczarek Dep., pp.13:7-14:2; 95:14-101:4; 104:24-109:20; Brickman Decl. Ex. 32, Neches Deposition p. 135:7-138:20; 152:19-153:20; Brickman Decl. Ex. 25; Brickman Decl. Ex. 33 (Bates R-0001831); Brickman Decl. Ex 34 (Bates R-0015353); Brickman Decl. Ex. 35 (Bates R-0005007-9); Brickman Decl. Ex. 5, Owczarek OSHA Dep., pp. 143:2-8; 146:15-19); and

f. after its decision to terminate Project Kalahari, and after Katzel raised concerns about the internal control weaknesses relating to its process for evaluating and pursuing strategic transactions, AIG, without explanation, quietly replaced the Strategic Transactions Policy with a new policy governing its decisions on strategic transactions. (Brickman Decl. Ex. 36, excerpt from AIG's Corporate Development Policy (Bates R-0019139)). In so doing, although the Compliance Department's review of Project Kalahari related issues pointedly neglected to address the internal control weaknesses shown in the company's failure to comply with its Strategic Transactions Policy, AIG implicitly acknowledged that the process revealed AIG's lack of effective controls governing its evaluation and pursuit of strategic transactions, and that it urgently needed to remedy this weakness. Other than the new policy document, AIG has failed to produce any evidence

in discovery relating to the process or considerations underlying adoption of this new policy.

10.     Katzel admits the statements contained in Paragraph 14, but notes that AIG's Statement is incomplete in that it fails to note that Alon Neches, AIG's Head of Corporate Development, when alerted to Katzel's concerns about the integrity of the process, conceded in writing that "Well... he's not wrong. " (Brickman Decl. Ex. 32, Neches Dep., p. 135:7-138:20; 152:19-153:20; Brickman Decl. Ex, 37 (Bates R-0000721).

11.     Under AIG's policies, the Corporate Development Department led by Neches was responsible for conducting an objective process to determine the value of TLOC and obtain arm's length terms for its carve-out from AIG. Thus, at the time his department was responsible for maximizing the value of an AIG asset the Company's outside advisors had valued at $700-800 million, Neches intentionally ignored the weaknesses and risks that had been called to his attention, and proceeded to oversee a process he knew was flawed. (Brickman Decl. Ex. 19).

12.     Katzel admits the statements contained in the first sentence of Paragraph 15 of AIG's Statement. Katzel lacks knowledge or information sufficient to admit or deny the truth of the statements contained in the remainder of Paragraph 15 of AIG's Statement, and observes that AIG's Statement fails to note that:

   a.     during Katzel's leadership of the LOC at AIG, Katzel and other members of the LOC's leadership regularly received feedback on the LOC's operations and performance from representatives of significant internal clients of the LOC, who participated in an internal advisory board constituted to oversee the operations of the LOC

(the "Steering Committee") (Katzel Decl. ¶¶7,8; Brickman Decl. Ex. 12, Katzel OSHA Dep., pp.46-9);

b.      the Steering Committee received regular updates on the LOC's activities and performance, expressed its views on desired enhancements to the LOC's services or operations, and followed the progress of such enhancements through regular Steering Committee meetings and reports (Katzel Decl. ¶¶7,8; Brickman Decl. Ex. 12, Katzel OSHA Dep., pp.46-9);

c.      additionally, before the Corporate Development team became involved in Project Kalahari, AIG's external advisor Oliver Wyman had solicited the views of senior executives regarding the LOC, including Chief Financial Officer Sid Sankaran, and Head of Commercial Business John Doyle, whose "…feedback [was] very positive with broad recognition that LOC has created value for AIG and that its proposition can be successful in the market" (Brickman Decl. Ex. 10, at Bates OW-00302);

d.      in addition to these sources of feedback, Katzel was informed that representatives of one of the LOC's most significant internal clients, the Casualty Claims group ("Casualty Group"), had expressed concerns that the Corporate Development team was conducting the surveys in a manner designed to intentionally undermine the value of the LOC, thereby negatively impacting AIG's insurance clients and shareholders; (Brickman Decl. Ex. 12, Katzel OSHA Dep., p. 45:25-48:10;49:21-50:7);

e.      Prompted, in part, by its concerns, the Casualty Group decided to conduct its own, separate survey of representatives of its users of shared services at AIG, to ensure it received a credible view of the value, and potential areas of desired enhancement, of such

services for clients of the Casualty Group (Brickman Decl. Ex. 38 (Bates R-0011067); Brickman Decl. Ex. 12, Katzel OSHA Dep., pp. 46-9);

f.      the meaningful divergence between the Corporate Development's team's report and the feedback Katzel received from the Steering Committee, external advisor Oliver Wyman, and the Casualty Group led him to believe that the Corporate Development team's survey contained flaws or errors that had impacted its results in a way that could mislead AIG's Executive team regarding the value of a material asset for AIG's shareholders and insurance clients (Brickman Decl. Ex. 39 (Bates R-0000289); Brickman Decl. Ex. 40 (Bates R-0001792); Brickman Decl. Ex. 22, Owczarek Dep., p. 48:17-22);

g.      when he raised questions regarding the methodologies used to conduct the survey with the Corporate Development team, Owczarek advised Katzel and Neches that the survey results had been destroyed and that Katzel could, therefore, not review them. (Brickman Decl. Ex. 41 (Bates R-0001831); Brickman Decl. Ex. 5, Owczarek OSHA Dep., pp.151:19-153:11; Brickman Decl. Ex. 33);

h.      Owczarek subsequently conceded that his destruction of the survey records was contrary to AIG's policy and his usual practice, further conceding that he had never shredded records related to any other project that he was involved in at AIG or elsewhere; (Brickman Decl. Ex. 5, Owczarek OSHA Dep., pp.210:20-211:11);

i.      Katzel believed that the stated destruction of records underlying a decision concerning a material asset and business opportunity violated AIG policies governing record retention, and potentially exposed a lack of appropriate internal controls relating to maintenance of material business records, in addition to raising a red flag about the

likelihood of other misconduct in connection with Project Kalahari (Brickman Decl. Ex. 42, Excerpts from AIG's Code of Conduct (Bates AIG-4873,4875,4885-4896); Brickman Decl. Ex. 43, AIG's Global Records and Information Management Policy which specifically reminds that "AIG prohibits retaliation against any Employee for making a good faith report of actual or suspected violation of laws, regulation, or this Policy." (AIG-5528-31);

j.  since the time of Owczarek's original assertion that the survey results had been destroyed and were no longer available, AIG has provided numerous, conflicting, explanations as to the status and treatment of the Corporate Development team's survey results, including during the pendency of the current dispute; (Brickman Decl. Ex. 12, Katzel OSHA Dep., pp.84:21-85:10);

k.  Katzel sought to remedy the apparent compliance violation and / or lack of internal controls by notifying AIG's Compliance Department pursuant to a separate set of internal controls it maintained to protect against fraudulent activity pursuant to federal securities regulations (Brickman Decl. Ex. 44, AIG's Corruption Risk Questionnaire (Nelson "14"); Brickman Decl. Ex. 45 (Bates R-0014865, Nelson "16"); and

l.  the existence of an alleged scanned hard copy of the survey results was not disclosed until after AIG's termination of Katzel and the commencement of the OSHA proceeding. (Katzel Decl. ¶9).

A.    Owczarek Consults with Accenture

13.    Katzel lacks knowledge or information sufficient to admit or deny the truth of the statements contained in Paragraph 16 of AIG's Statement, but notes that AIG's Statement is misleading in that it fails to disclose that the March 2016 Accenture "back of the envelope" analysis referred to therein:

a.    was not related to Project Kalahari (Brickman Decl. Ex. 46 (Bates R-0003995, Perera "4"); Brickman Decl. Ex. 47 (Bates R-00002667-9);

b.    was prepared by a firm that, notwithstanding its admitted lack of experience in the area of legal operations, sought to compete with, and ultimately was awarded an external business opportunity pursued by AIG's TLOC subsidiary (Brickman Decl. Ex. 48 (Bates UBS-000057-9); Brickman Decl. Ex 49 (Bates Accenture-003681-4);

c.    was developed without the involvement of, and was never validated by, any representatives of the LOC or the users of its services (Katzel Decl. ¶10);

d.    was not disclosed to any representatives of the LOC or to AIG's Chief Legal Officer until nearly 7 months after it had been prepared (Katzel Decl. ¶10);

e.    was commissioned by Chaz Perera, the Head of Claims Operations, for the purpose of lending support to an effort he led to reduce AIG's Claims General and Administrative costs by 5 percent. This project was unrelated to Project Kalahari. In an e-mail exchange with Accenture, Perera revealed his bias against AIG delivering legal operations and procurement services to external clients, derisively calling it a "pet project" and a waste of time. (Brickman Decl. Ex. 47; Brickman Decl. Ex. 6 (at R-0004128,

0004176); Brickman Decl. Ex. 50 (Bates Accenture-0000041-9; and specifically 000041, 000043, and 0000047-0000049)); and

     f.     Notwithstanding his awareness of Perera's bias, Owczarek involved Perera extensively in the Kalahari analysis and carveout process in an effort to prevent AIG from pursuing this business opportunity. (Brickman Decl. Ex. 51 (Bates R-000099809, Perera (18); Brickman Decl. Ex. 52 (Bates R-0018402, Perera ("19")).

14.     Katzel lacks knowledge or information sufficient to admit or deny the truth of the statements contained in Paragraph 17 of AIG's Statement, but notes that AIG's Statement is misleading in that Accenture's March 2016 analysis was not prepared in accordance with either the procedures required to enter consulting engagements under applicable AIG policies, or the Professional Consulting Services Agreement proffered by AIG. Rather, as disclosed in correspondence between Perera and Accenture, the analysis was created as an uncompensated favor to Perera, in the hope of obtaining subsequent business opportunities from Perera and/or AIG. (Brickman Decl. Ex. 53, McCormack OSHA Deposition, pp. 89:15-22; 99:3-8; Brickman Decl. Ex. 54 (Bates AIG-0003419-21)).

15.     Katzel lacks knowledge or information sufficient to admit or deny the truth of the statements contained in Paragraph 18 of AIG's Statement, but notes that AIG's Statement is misleading in that it fails to disclose that:

     a.     Accenture and AIG did not enter into an engagement with respect to the creation of the March 2016 analysis, as required under AIG policies and the terms of the Professional Consulting Services Agreement (Brickman Decl. Ex. 53, McCormack OSHA Deposition, pp. 89:15-22; 99:3-8; Brickman Dec. Ex. 5, Owczarek OSHA Deposition, p.

107:16-24; Brickman Decl. Ex. 55, Excerpts from AIG's Conflict of Interests Policy (Bates R-0019136);

b.      the information apparently provided by Ms. Hu to Accenture constituted "firm confidential" business information under applicable AIG Compliance policies, which prohibited the distribution of such information, absent certain protective measures specified in AIG's compliance policies, which were neither sought nor obtained (Brickman Decl. Ex. 43, AIG Global Records and Information Management policy; Brickman Decl. Ex. 53, McCormack OSHA Dep., p.79:17-19);

c.      Ms. Hu, apparently under the direction of Perera, nonetheless provided that information in violation of AIG's compliance policies, to a business competitor of AIG's TLOC, which subsequently competed against TLOC for the opportunity to provide outsourced legal operations and procurement services to UBS. (Brickman Decl. Ex. 56 (Bates R-000124); Brickman Decl. Ex. 48; Brickman Decl. Ex. 49);

d.      UBS issued a Request for Proposal ("RFP") for a vendor to supply these services. Accenture and TLOC were competing bidders for this work. They were chosen as the two finalists and Accenture was ultimately selected as the vendor. Accenture entered into a contract wit, UBS to provide these services. One of the Accenture representatives who had participated in discussions with Perera on the LOC cost structure was also involved in the Accenture bid for the UBS services, notwithstanding his possession of sensitive confidential information of AIG and TLOC that provided Accenture with a competitive advantage in the process (Brickman Decl. Ex. 48; Brickman Decl. Ex. 49;

Brickman Decl. Ex. 57 (Bates R-0009266-7); Brickman Decl. Ex. 58 (Bates R-0006029-55, Neches "27"));

 e. access to the confidential information relating to the LOC's operating model and cost structure provided Accenture with a competitive advantage in structuring its bid to provide outsourced legal operations and procurement services to UBS, raising potential concerns under applicable anti-monopolization and anti-competition laws (Brickman Decl. Ex. 59 (Bates R-0006192-5); Brickman Decl. Ex. 60 (0000742-5); Brickman Decl. Ex. 12, Katzel OSHA Dep., pp.86:21-87:15);

 f. AIG's statement that "Owczarek did not provide any information about the LOC or TLOC to Accenture beyond what Hu had already provided to it," is contradicted by AIG's own statements and evidence it has produced in connection with this dispute (Brickman Decl. Ex. 22, Owczarek Dep., pp. 24:13-25:15; Brickman Decl. Ex. 61 (Bates R-0001424-5); Brickman Decl. Ex 5, Owczarek OSHA Dep., pp.96:16-97:5; 100:4-101:12; 105:3-18); and

 g. following the termination of Kalahari and the wind-down of TLOC, AIG entered into agreements pursuant to which Accenture is to deliver material services to AIG on an outsourced basis, receiving millions of dollars in compensation in connection therewith. Brickman Decl. Ex. 62, Fortune Article.

16. Katzel admits the statement contained in Paragraph 19 of AIG's Statement, but states that AIG's Statement is misleading in that it omits to disclose that:

a.      as conceded in his own correspondence, Saldanha, the Accenture consultant whose advice was sought by Perera and Owczarek, lacked the relevant knowledge and experience regarding the legal operations and procurement services and industry of the LOC and TLOC necessary to deliver an informed opinion on the appropriate operating model and cost structure for the services delivered to its clients, but still recognized value in the LOC/TLOC (Brickman Decl. Ex. 63 (Bates Accenture-0000114); Brickman Decl. Ex. 64 (Bates Accenture-0000161-86; Brickman Decl. Ex. 65 (Bates Accenture-0000192-5));

b.      notwithstanding Owczarek's assertion, Owczarek was aware that Accenture was a competitor to TLOC, and Accenture did in fact expressly compete with TLOC for business opportunities, participating with TLOC and other potential providers in the bidding process to deliver legal procurement and operations services to UBS, with respect to which Accenture ultimately was selected and entered into a long term contract; (Brickman Decl. Ex. 5, Owczarek OSHA Dep., pp. 94:17-21; 95:18-19; Brickman Decl. Ex. 66 (Bates Accenture-0000075; Brickman Decl. Ex. 67 (Bates Accenture-0000102-9); Brickman Decl. Ex. 68 (Bates Accenture-0000523-44); Brickman Decl. Ex 69 (Bates Accenture-0003072-89); Brickman Decl. Ex. 70 (Bates Accenture-00002361-0002646));

c.      the confidential business information regarding the LOC and TLOC provided to Accenture by Owczarek and Hu conveyed a competitive advantage to Accenture in structuring its operating model and bid for the UBS as well as other opportunities (Brickman Decl. Ex. 47; Brickman Decl. Ex. 71 (Bates R-0000321-2); Brickman Decl. Ex. 72 (Bates Accenture-0000746-9); Brickman Decl. Ex 73 (Bates Accenture-0001258-69)); and

d.    the actions taken by Hu, Perera, Owczarek and Neches improperly diverted a valuable business opportunity sought by AIG's TLOC to its competitor, Accenture, in violation of AIG's Code of Conduct and compliance policies governing conflicts of interest. (Brickman Decl. Ex. 43, AIG Code of Conduct (AIG-0004886, 0004891); Brickman Decl. Ex. 74 (Bates AIG-0005075); Brickman Decl. Ex.55).

17.    Katzel lacks knowledge or information sufficient to admit or deny the truth of the statements contained in Paragraph 20 of AIG's Statement, but notes that AIG's Statement is misleading in that it omits to disclose that:

a.    in her role at AIG, Ms. Hu was not in a position to have the knowledge or authority to provide an informed or authoritative response to Owczarek's question regarding AIG's outsourcing decisions, and, therefore, Owczarek and AIG's reference to her statement are, at best, irrelevant, and more seriously, potentially deceptive (Brickman Decl. Ex. 75 (Bates R-0013390, Perera "12"); Brickman Decl. Ex. 76 (Bates Accenture-0000209-10);

b.    moreover, notwithstanding having committed to do so, Owczarek concedes that he did not seriously investigate Katzel's concerns that AIG firm confidential information had been improperly delivered to a competitor of TLOC, who also sought to bid to AIG to provide it with legal procurement management services (Brickman Decl. Ex. 5, Owczarek OSHA Dep., pp. 122:14- 123:8; 126:13-19; 127:6-11);

c.    in fact, as set forth in the March 2016 "Optionality" presentation presented by Perera to AIG's Claims Executive leadership team, one of the options being considered

by AIG was outsourcing the services provided by the LOC work to a third-party vendor (Brickman Decl. Ex.6; Brickman Decl. Ex.60; Brickman Decl. Ex. 50); and

  d.  Accenture was made aware that AIG was considering outsourcing some or all of the services delivered by the LOC to a third-party vendor, was invited through an RFP conducted by Perera to offer outsourcing advice and services to AIG, and also discussed broader outsourcing arrangements with other senior AIG executives (including services provided by the LOC) (Brickman Decl. Ex. 75; Brickman Decl. Ex. 50; Brickman Decl. Ex. 77 (Bates Accenture-0000151-7).

IV. The Executive Leadership Team Reviews Corporate Development's Findings and Ends Project Kalahari

18. Katzel admits the statements contained in Paragraph 21 of AIG's Statement, but notes that AIG's Statement is misleading in that it fails to mention that the report and findings presented by the Corporate Development team to AIG Executive Leadership

  a.  was created for the purpose of influencing their decision with respect to Project Kalahari (Brickman Decl. Ex. 22, Owczarek Dep., p.8:7-15; Brickman Decl. Ex. 13, Sankaran Dep., p. 138:16-139:5);

  b.  relied on materials the Corporate Development team knew to be false and/or misleading (Brickman Decl. Ex. 26; Brickman Decl. Ex. 13, Sankaran Dep., pp. 178:17-179:24; Brickman Decl. Ex. 22, Owczarek Dep., p. 140: 6-22);

  c.  relied on materials that Chief Financial Officer Sankaran altered in order to undermine the prior independent evaluation which AIG's external advisor, Oliver Wyman,

had delivered in support of the $700-800 million business opportunity, (Brickman Decl. Ex. 78 (Bates R-0006023-8); Brickman Decl. Ex. 79 (Bates R-0007893-50; Brickman Decl. Ex. 10; Brickman Decl. Ex. 11; Brickman Decl. Ex. 15); and

      d.      based in large part on the unvalidated views of a competitor for a business opportunity actively being sought by AIG's TLOC, which had financial incentives to terminate the TLOC business and weaken the LOC (Brickman Decl. Ex. 26; Brickman Decl. Ex. 80 (Bates Re-0000123-4, Perera "22").

19.      Katzel lacks knowledge or information sufficient to admit or deny the truth of the statements contained in Paragraph 22 of AIG's Statement, but states that Katzel was excluded from the meeting of AIG's Executive Leadership Team ("ELT") regarding Project Kalahari and was not afforded the opportunity to review or comment on the package of materials relating to Project Kalahari that was presented to the ELT prior to their presentation. (Brickman Decl. Ex. 81 (Bates R-0018883-5, Solmssen "22");

20.      Katzel lacks knowledge or information sufficient to admit or deny the truth of the statements contained in Paragraph 23 of AIG's Statement, but notes that AIG's Statement is inconsistent with testimony of its former Chief Legal Officer Solmssen, and is misleading in failing to disclose that:

      a.      Solmssen has acknowledged that he never reviewed the surveys or any of the memoranda summarizing the surveys and that those surveys played no role in Solmssen's decision to terminate Project Kalahari. Moreover, he conceded he was unaware that experienced external investors had expressed an interest in investing in TLOC, or that AIG's outside advisors had estimated the potential equity value of TLOC to be $700-800

million (Brickman Decl. Ex. 30 Solmssen Dep., pp. 76:5-18; 80:14-18; 131:19-132:9; Brickman Decl. Ex. 31, Solmssen OSHA Dep., pp. 28:15-19; 32-4-14);

b.      notwithstanding the written policy adopted by AIG pursuant to the settlement agreement with the DOJ and SEC to clarify authority at AIG on decisions regarding strategic transactions, Solmssen stated that while at AIG he, acting unilaterally, had authority to terminate, and did make the decision to terminate, Project Kalahari (Brickman Decl. Ex. 82, Excerpt from the ¶ XX] [Bates AIG_0005532 - Strategic Transactions Policy and Procedures of American International Group, Inc. (Bates AIG-0005532); Brickman Decl. Ex. 22, Owczarek Dep., p 13:14-25; Brickman Decl. Ex. 30, Solmssen Dep., p. 80:14-18);

c.      despite his role as leader of AIG's legal and compliance function, and the requirement that all managers complete training and certification on compliance policies, Solmssen conceded that he did not review or familiarize himself with AIG's applicable legal and compliance policies prior to deciding to terminate AIG's participation in the UBS RFP, and was generally unfamiliar with the policies governing corporate authority and decision-making or compliance policies regarding conflicts of interest, record retention, or protection against fraud (Brickman Decl. Ex. 31, Solmssen OSHA Dep., pp. 24:22-25:21; 26:13-22; 27:15-20; Brickman Decl. Ex. Solmssen Dep., pp. 15:16-17:21); and

d.      subsequent to its decision to terminate Project Kalahari, without explanation, AIG adopted an updated policy governing its decisions on strategic transactions. (Brickman Decl. Ex. 36).

V.      <u>Katzel Certifies That He Lacks Knowledge of Any Violation of Law, Regulation, or Policy</u>

21.      Katzel admits the statements contained in Paragraph 24 of AIG's Statement.

22.      Katzel admits the statements contained in the first, third, and fifth sentences of Paragraph 25 of AIG's Statement. Katzel admits that he completed Code of Conduct certifications periodically while employed by AIG but lacks knowledge or information sufficient to admit or deny the truth of the statement contained in the second sentence of Paragraph 25 of AIG's Statement. Katzel notes that AIG's Statement fails to disclose that the record cited by AIG to support its assertion does not include a completed, dated copy of the certification, indicates that it was created on September 22, 2021 (more than 4 years after Katzel's termination), and shows that it had apparently been "archived" by Katzel on November 29, 2017, more than five months after AIG terminated Katzel's employment (Brickman Decl. Ex. 83 (at AIG-5579-9).

VI.      <u>Katzel Responds to AIG's Fraud Risk Assessment, Indicating He is Unaware of Fraud</u>

23.      Katzel admits the statements contained in Paragraph 26 of AIG's Statement, but notes that AIG's Statement fails to disclose that the Corruption Risk Questionnaire specifically referenced that it was circulated as part of processes required under various state and federal regulatory requirements, and was intended to identify instances of fraud-related risk at AIG. (Brickman Decl. Ex. 44; Brickman Decl. Ex. 53, McCormack OSHA Dep., pp. 36:2-37:8).

24.      Katzel admits that he received the Corruption Risk Questionnaire and reminders to complete the same while employed by AIG, but lacks knowledge or information sufficient to admit or deny the truth of the timing and frequency of such events contained in Paragraph 27 of AIG's Statement.

25.     Katzel admits the Statements contained in the first sentence of Paragraph 28 of AIG's Statement, and admits the statements contained in the second sentence of Paragraph 28 in part, but notes that such statements are incomplete and misleading in that:

a.      the concerns regarding potential compliance violations and internal control gaps exhibited during the Kalahari project at AIG were raised and discussed by Katzel with Mr. Horton and Ms. McCormack over the course of several meetings and calls, as well as with AIG's Chief Compliance Officer, Karen Nelson, based on the evidence available to him at that time and noting the fact that AIG itself considered actionable fraud to "encompass a broad range of conduct involving deception in connection with…misappropriation of company or customer assets." (Brickman Decl. Ex. 45; Brickman Decl. Ex. 53, McCormack Dep., pp. 45:4-47:11; Brickman Decl. Ex. 84, Nelson Dep., pp. 99-100, 127:25-128:17; Brickman Decl. Ex. 85, AIG Global Fraud Reporting Policy (Bates R-19130-4, Nelson "7");

b.      in connection with one such meeting, Katzel provided McCormack with copies of materials to aid in the review and further investigation by AIG's Compliance Department, including materials demonstrating the apparent conflicts of interest, sharing of confidential materials with business competitor Accenture, and intentional destruction of corporate records relating to the Corporate Development team's internal evaluation, which supported the concerns identified by Katzel as to compliance violations and weaknesses in AIG's internal control environment (Brickman Decl. Ex.45);

c.      Katzel, Horton and McCormack agreed a review and further investigation by AIG's Compliance Department of the potential compliance violations and internal

control gaps identified by Katzel was warranted based on the then available evidence; (Brickman Decl. Ex. 53, McCormack Dep., pp. 44:7-45:7; Brickman Decl. Ex. 81);

d.    Katzel's concerns regarding violations of AIG's compliance policies presented by Owczarek's interactions with Accenture arose also, in part, because at the time of the Kalahari project, Accenture was competing with AIG's TLOC for the UBS business opportunity (Brickman Decl. Ex. 22, Owczarek Dep., p. 119:11-18; Brickman Decl. Ex. 72; Brickman Decl. Ex. 73);

e.    under relevant AIG policies, the Compliance Department had the authority and responsibility to conduct an investigation into each of the foregoing concerns regarding compliance violations and internal control weaknesses and, based on the results and findings of its investigation, to take remedial action and/or refer such concerns to other departments and/or governance bodies in AIG with the authority and responsibility to conduct further investigations that may have been required under applicable law and/or AIG policies (Brickman Decl. Ex. 86, Procedure for the Escalation of Compliance Allegations for Investigation (Bates AIG-0005522); Brickman Decl. Ex. 84, Nelson Dep, pp. 43:2, 89:23);

f.    although Katzel did not have access to such materials at the time, evidence subsequently collected and produced by AIG confirms that Katzel's beliefs as to compliance violations and weaknesses in AIG's internal control environment were reasonable and well founded; and

g.    the compliance violations and internal control weaknesses identified by Katzel, and subsequently confirmed by evidence provided by AIG, represented violations

of Rules 13a-15(c), and 15d-15(c) of the Exchange Act concerning internal controls and management representations concerning the same, Rule 13(b)(2) of the Exchange Act concerning record keeping and the proper maintenance of internal controls regarding, <u>inter alia</u>, record keeping, 18 U.S.C. §1514(a) concerning, among, other things, fraudulent collusion to divert a material opportunity away from AIG to a business competitor, and conflicts of interest operating to the detriment of shareholders; and 18 U.S.C. §1348 and §1349 concerning efforts to conceal those improprieties. (Brickman Decl. Ex. 84, Nelson Dep., pp. 77:4-5; 81:18-21, 89:23; 95:7; 97:23-25; 98:17; 99:17; 99:19-100:20; Brickman Decl. Ex. 43; Brickman Decl. Ex. 86, Procedure for the Escalation of Compliance Allegations for Investigation (Bates AIG-0005522); Brickman Decl. Ex. 87 AIG Global Employee Conflict of Interest Policy Bates R-0019135-8); Brickman Decl. Ex. 85, AIG Global Fraud Reporting Policy; Brickman Decl. Ex. 88, AIG Corporate Investigative Protocols (Bates AIG-0004862); Brickman Decl. Ex. 12, Katzel OSHA Dep., pp. 224:9-228:11).

26.     Katzel admits the statements contained in Paragraphs 29 and 30 of AIG's Statement.

27.     Katzel denies the statement contained in the first sentence of Paragraph 31 of AIG's Statement. AIG's Compliance Department failed to investigate whether the conduct of Owczarek and others on the Corporate Development team during Project Kalahari violated AIG's compliance policies regarding conflicts of interest and maintenance of business records and / or demonstrated the existence of internal control weaknesses in the processes used to evaluate strategic business transactions involving significant assets of the company. The cursory review conducted by the Compliance Department regarding the sharing of confidential information was not documented in

a written report in accordance with AIG's customary practice. Instead, in a departure from AIG's usual approach, Solmssen explicitly requested that the report of the Compliance Department's purported investigation be conveyed to him solely by means of a telephone call, the content of which was set forth in a set of draft talking points. Solmssen subsequently denied, under oath, being involved in instructing Compliance to diverge from its customary approach. These draft talking points contained obvious factual errors, and failed to examine the circumstances surrounding, and the internal control weaknesses that failed to prevent or trigger notification of, the delivery of confidential business information to a competitor during a pending bid for a substantial transaction in which an AIG business was participating, in the absence of proper authorization or an applicable written confidentiality agreement. Further, AIG never conducted any forensic review of its electronic mail or other information technology infrastructure to determine which employees were involved in the violations of AIG's compliance policies and whether, and to what extent, other misconduct occurred in connection with Project Kalahari. Moreover, Solmssen was aware that the compliance review failed to consider internal control failures associated with the Kalahari process, but was not interested or concerned about examining or addressing such failures (Brickman Decl. Ex. 89 (Bates R-0015410-11); Brickman Decl. Ex. 90, AIG's Global Information Handling Standards (Bates R-0019149-52); Brickman Decl. Ex. 84, Nelson Dep., pp. 105:2-24; 133:22-134:5; 149:10-150:9; 168:7-15; 178:4-180:10; 190:11-20; 196:10-24; 201:5-25; 205:2-5; 206:11-21; Brickman Decl. Ex. 53, McCormack Dep., pp. 75:5-77:10; 79:7-11; 99:3-8; 138:11-16; Brickman Decl. Ex. 30, Solmssen Dep., pp. 108:2-8; 16-17; 110:16-17; 111:11-23; Brickman Decl. Ex. 31, Solmssen OSHA Dep., p. 30:14-23; 36:15-24; Brickman Decl. Ex. 91).