```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
AARON KATZEL,                                                 :
                              Plaintiff,                      :   ORDER AND OPINION
       v.                                                     :   GRANTING DEFENDANT'S
                                                              :   MOTION FOR SUMMARY
AMERICAN INTERNATIONAL GROUP,                                 :   JUDGMENT
                                                              :
                              Defendant.                      :   20 Civ. 7220 (AKH)
                                                              :
------------------------------------------------------------- X
```

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Plaintiff Aaron Katzel ("Plaintiff") brought this suit against his former employer Defendant American International Group ("Defendant" or "AIG"), alleging that he was terminated in retaliation for blowing the whistle on violations of federal fraud and securities laws. He claimed that his termination violated the whistleblower protections of Section 806 of the Sarbanes Oxley Act of 2002 ("SOX") and the Dodd-Frank Act ("DFA"), 18 U.S.C. § 1514A. He also asserted state-law claims for breach of contract and tortious interference with contract based on his failure to receive AIG stock and other equity awards pursuant to a Long-Term Incentive Plan (LTIP), managed by a third-party administrator, causing him damages in excess of $1.2 million dollars.

        Defendant moves for summary judgment (ECF No. 82), arguing that Plaintiff has failed to establish a prima facie claim for SOX whistleblower retaliation because he cannot establish that he engaged in protected activity or that AIG had knowledge of such activity. Defendant argues Plaintiff did not engage in protected activity because he lacked a reasonable subjective or objective belief that AIG committed mail, wire, or bank fraud, or violated any other provision of federal law relating to fraud against shareholders, or violated any federal securities laws or regulations. Furthermore, because Plaintiff did not report a violation of the federal

1

securities laws until five years after his termination, he could not have been terminated for said reporting.  Defendant additionally argues that Plaintiff has failed to establish that Defendant had knowledge that Plaintiff engaged in such activity, as all of Plaintiff's supervisors testified that they did not understand him to be making allegations of fraud or securities violations.  Finally, Defendant argues that Plaintiff cannot establish a claim for retaliatory termination because Defendant's lack of knowledge as to Plaintiff's protected activity precludes a finding that he was terminated with retaliatory intent.

Plaintiff opposes, arguing that his reporting of compliance failures constituted protected activity, and that Defendant's arguments are premised on a distortion of the facts and a downplaying of its fraudulent conduct.

I agree with Defendant.  There is no genuine dispute of material fact as to either of Plaintiff's federal claims.  Plaintiff cannot establish a prima facie claim for whistleblower retaliation because the record evidence shows that he did not engage in protected activity, and even if he did, Defendant lacked knowledge of such activity.  Plaintiff also cannot establish a claim for retaliatory termination because there is no evidence that Defendant terminated Plaintiff with retaliatory intent.  Defendant is entitled to summary judgment as a matter of law.  For these and other reasons provided below, the motion is granted.

## BACKGROUND

Plaintiff is former in-house counsel for AIG.  ¶¶ 1, 3.[1]  After obtaining his law degree from the University of Pennsylvania and working at two global law firms among the most respected in the area of securities law, Plaintiff joined AIG in 2006, where he worked as the head of AIG's Legal Operations Center (the "LOC") until his termination on May 4, 2017.  ¶¶ 1, 2, 3. The LOC was responsible for reducing or controlling AIG's external legal costs and spending,

---

[1] Unless otherwise noted, "¶" refers to paragraphs in the Local Civil Rule 56.1 Statement of Undisputed Material Facts, ECF No. 85.

including managing the rates and terms of external legal services providers. ¶ 3. Its clients or customers were various departments and other functions within AIG. ¶ 4. While working at AIG as head of the LOC, Plaintiff reported to AIG's General Counsel, or Chief Legal Officer, a position held by Thomas Russo until Russo retired in October 2016; Plaintiff then reported to Peter Solmssen ("Solmssen"). ¶ 5.

### *Plaintiff's Reporting Requirements*

As head of the LOC, Plaintiff's duties also included completing certifications as requested by AIG. ¶ 24–26.

First, AIG required all officers and employees to complete a 2016 AIG Code of Conduct Certification, certifying, among other things, that they had read and complied with AIG's 2016 Code of Conduct. ¶ 25. One question asked whether an officer or employee had knowledge of any violations of the Code of Conduct, AIG policy, law or regulation—including violations of any rule or regulation promulgated by the Securities and Exchange Commission or violations of any provision of federal law relating to fraud against shareholders, mail fraud, wire fraud, bank fraud, and securities fraud—to report. ¶ 25.

Second, Plaintiff was required to respond to a Corruption Risk Questionnaire. It identifies four categories of corruption risk (conflicts of interest, bribery, illegal gratuities, and economic extortion) and contained two questions. ¶ 26. First, it asked whether Plaintiff had any knowledge of any fraud perpetrated or alleged or suspected that could result in a material misstatement of AIG's financial statements, and second, whether for the four categories of risk, Plaintiff had any knowledge of any fraud at AIG, perpetrated, alleged, or suspected, regardless of materiality. ¶ 25.

### *Plaintiff's Compensation*

As part of his compensation, each year Plaintiff received long term incentive compensation ("LTIP compensation"), a grant of stock to be delivered after a set number of

years if AIG met certain performance metrics. ¶¶ 52, 53.  The LTIP Compensation was governed by a contract called the Long Term Incentive Plan ("LTIP"), and each issuance of particular grants of equity compensation were governed by separate "Award Agreements." ¶¶ 52, 54.  Plaintiff received awards for 2013-2016 under the 2013 LTIP and for 2017 under the 2017 LTIP; both agreements gave AIG the right to rescind a plan participant's LTIP Compensation unless he accepted the applicable Award Agreement.  ¶¶ 52, 54.

### *Events Leading to Plaintiff's Termination*

During his leadership of the LOC, Plaintiff developed a business plan to carve out the LOC into an external-facing entity, called The Legal Operations Company ("TLOC"), that would manage legal spending for other companies in addition to servicing AIG's activities.  ¶ 7.  If the carve-out had been completed, Plaintiff expected to be the President and Chief Executive Officer of, and to receive equity in, TLOC.  ¶ 7.

Starting in 2015, AIG began to evaluate the carve-out plan and referred to its evaluation of the potential business as "Project Kalahari."  ¶ 8.  The goal of Project Kalahari was to explore whether the LOC could be more valuable to AIG as an independent entity with external investors and clients.  ¶ 8.  In May 2016, AIG's Corporate Development group was tasked with leading Project Kalahari, and Konstanty Owczarek ("Owczarek"), a managing director of that group, was assigned to the project.  ¶ 9.  As part of its review, the Corporate Development team conducted a survey of some of the LOC's internal clients and interviewed the participants in order to better understand "the value proposition of [the] LOC and its services" by analyzing how the LOC's internal clients viewed the LOC.  ¶ 10.  Plaintiff commented on the proposed survey participants before the survey was conducted.  ¶ 10.

The survey results revealed general dissatisfaction with the overall quality of the services provided by the LOC and the quality of the LOC's management team.  ¶ 11. Participants were asked to rate the overall quality of the services, the comprehensiveness of the services

4

provided, the quality of the LOC's management team, and the ease of using its services, on a scale from poor to excellent. ¶ 11. No one responded "excellent" and only one person responded "good" to any of these questions. ¶ 11. Subsequent interviews with the participants, summarized in memoranda, reflected that the participants had a generally negative view of the LOC and many of them stated they believed that the LOC had too many employees. ¶ 12. The Corporate Development team shared a summary of the results with Plaintiff. ¶ 13.

By October 2016, however, Plaintiff developed a concern that the results were inaccurate. The survey results, he believed, based on his discussions with participants, left out many positive results about the "tremendous value delivered" by the LOC. ¶ 14. He relayed his concerns to Owczarek that Project Kalahari was not "conducted in a way that would lead AIG to be able to extract the best possible value out of the asset for the company and its shareholders." ¶ 14. Plaintiff also developed a concern that the original hard copy of the surveys had been shredded; however, they were shredded only after the results were scanned and saved electronically. ¶ 15. Plaintiff has received a copy of the scans. ¶ 15.

During his review of the LOC, in September 2016, Owczarek spoke with a member of consulting firm retained by AIG, Accenture, concerning its analysis of ways to cut costs at LOC. ¶¶ 16–17. Accenture's analysis was commissioned by AIG's claims operations group, one of the LOC's internal clients, which also was examining ways to cut costs for claims operations, including costs spent on the LOC. ¶ 18. In connection with that review, Lina Hu of AIG sent a document with the file name "Legal Operations Center – GOE Walk" to Accenture. ¶ 18.

In September 2016, Owczarek told Plaintiff that he wanted to involve Accenture to "think through a cost model" for the LOC. ¶ 19. Plaintiff was concerned with AIG's decision to share information with Accenture because he believed Accenture might have a conflict of interest. ¶ 19. Plaintiff believed that Accenture did procurement services for AIG and might use

5

the information to poach employees or to try to build business for AIG. ¶ 19. Owczarek told Plaintiff that the consultant was not bidding to provide AIG any services and was not a competitor for the LOC. ¶ 19. Plaintiff also disagreed with Accenture's analysis, describing it as "phony" and a "low ball bid for the business and [AIG's] IP." He wrote to Owczarek on October 13, 2016, that "Accenture was involved from the beginning," and that it looked like they were trying to influence the process behind the scenes. ¶ 19.

After Plaintiff raised his concerns, Owczarek asked Hu whether AIG was considering outsourcing LOC's work to Accenture, and she said that AIG was not. ¶ 20. Plaintiff told Owczarek that another consulting firm assisting in Project Kalahari told Plaintiff that AIG was considering outsourcing to Accenture; the only source identified by the consulting firm was Plaintiff. ¶ 20.

In October 2016, the Corporate Development team drafted a summary of its findings on Project Kalahari. ¶ 21. It found that almost all of LOC's current clients did not attach high value to the full suite of products and that the LOC management proposal did not provide a meaningful cost reduction potential. ¶ 21. Owczarek presented the findings to AIG's Executive Leadership Team, including with his report materials provided by Plaintiff. ¶ 22. The team, including Solmssen, decided to end Project Kalahari and not to carve out the LOC. ¶ 23. Solmssen believed that the idea of carving out was generally a bad idea, based on what he had seen at other companies and because colleagues at AIG informed him that LOC was not providing good services internally. ¶ 23. To wit, Solmssen believed that it was "inconceivable that one could make a successful sale of the company whose only customer hates it" and that "nothing good could come of" carving out the LOC. ¶ 23.

On November 28, 2016, Plaintiff completed his 2016 Code of Conduct certification. ¶ 25. He stated that he had no knowledge of any violations. ¶ 25. In his

deposition, Plaintiff further testified that he always sought to be candid in his certifications and filled out the certifications in good faith and based on his knowledge and belief at the time. ¶ 24.

On November 3, 2016, Plaintiff received the Corruption Risk Questionnaire; he also received reminders from Scott Horton, a member of the Compliance Department, to complete the questionnaire on November 14 and 30, 2016. ¶ 27. Katzel met with Horton and Horton's supervisor to discuss the questionnaire before filling it out. ¶ 28. At the meeting, Plaintiff raised three concerns. ¶ 28. First, that the "process with which the company pursued strategic transactions had serious gaps that meant that it could not be assured that those transactions were being pursued in a way that maximize[s] the value to" AIG, as highlight by Owczarek's behavior throughout the Kalahari process and by the fact that Corporate Development's survey and "negotiations around the carve out" were "conducted in a highly suspicious way." ¶ 28. Second, "[t]hat the internal control environment surrounding preservation of business records was inadequate" because he believed that "the notes underlying [Corporate Development's] surveys have been destroyed. ¶ 28. Finally, that "[e]nforcement of the compliance policies of the company including how sensitive confidential information and business secrets were treated and compliance with antimonopoly policy" might be inadequate because AIG shared confidential information about LOC with Accenture, which Katzel believed was "looking to bid to provide services to AIG." ¶ 28.

Plaintiff responded to the Corruption Risk Questionnaire on December 1, 2016, stating that he did not have "any knowledge" of "any fraud" that could result in a material misstatement of AIG's financial statements," or "any specific knowledge" of "any other fraud" relating to the four categories of Corruption Risk. ¶ 29. Contemporaneously, Plaintiff emailed Horton that he believed "it would be worthwhile . . . to evaluate the advisability of review and testing on the robustness of conflict of interest protections in the processes followed by certain functions responsible for significant transactions" at AIG. ¶ 30. He further stated that "[s]uch

7

review and testing could provide additional comfort that [AIG] consistently follow[ed] rigorous processes and procedures that supported [its] ability to make and implement decisions that maximize shareholder value in such transactions." ¶ 30.

In response to Plaintiff's reported concerns, AIG's Compliance Department undertook an investigation. ¶ 31. The Compliance Department is not charged with investigating fraud, a task reserved to AIG's investigations group. ¶¶ 31, 38. Because Plaintiff never stated that he was concerned about conduct constituting fraud, bank fraud, wire fraud, securities fraud, a violation of SEC rules, a violation of federal law, or fraud against AIG shareholders, and none of Plaintiff's supervisors understood him to be reporting such conduct, the investigations group did not get involved. ¶¶ 31, 37, 38.

In connection with the Compliance Department's investigation, Horton interviewed Plaintiff, memorialized in Horton's handwritten notes. ¶ 32. During the interview, Plaintiff told Horton that he was concerned that Accenture would use information about the LOC to underbid in every case. ¶ 32. Plaintiff also stated that he believed that Corporate Development's survey included individuals who were never actually LOC customers and that certain positive feedback was not reflected. ¶ 32. Plaintiff expressed concern that the ELT might not be getting the best information for matters of transactions or strategies. ¶ 32. Finally, Plaintiff told Horton that the survey results were shredded. ¶ 32.

In addition to interviewing Plaintiff, the Compliance Department interviewed Hu; Hu's supervisor, Charith Perera; and Owczarek. ¶ 33. The Compliance Department also discussed Plaintiff's complaints with the corporate compliance's privacy team and human resources. ¶ 33. In addition, it reviewed various background emails and documents concerning Plaintiff's claims, including those provided by Plaintiff. ¶ 33.

At the completion of its investigation in February 2017, the Compliance Department summarized its findings in talking points, prepared in anticipation of a meeting with

Solmssen. ¶ 34. The talking points stated that Plaintiff's concerns related to ensuring that "the company consistently follows rigorous processes and procedures to support the decision-making process with respect to potential transactions." ¶ 34. The Compliance Department determined that there was no merit to the issues raised and found no indication of a potential conflict of interest with Accenture. ¶ 35. It found that AIG's claims operations group arguably failed to follow the terms of the Master Service Agreement with Accenture, which required a specific Statement of Work for Accenture's review of LOC, and thus could have violated AIG's Global Information Handling Standards. ¶ 35. However, it further found that any risk related to the sharing of information with Accenture was mitigated by the fact that the Master Agreements contain broad confidentiality and data security language requiring Accenture to safeguard the firm's confidential information. ¶ 35. With respect to corporate development's review of the LOC, nothing unusual was found with respect to the surveys, and the Compliance Department further determined that use of manual surveys was reasonable under the circumstances and given the small scale. ¶ 35.

At the close of the investigation, Global Chief Compliance Officer Karen Nelson discussed the findings with Plaintiff, thanked him for raising the issues, and informed him that a review was done and found no merit to the issues raised. ¶ 36. As he had done throughout the course of the investigation, Plaintiff continued to serve as head of the LOC. ¶ 39.

At the end of 2016, Solmssen gave Plaintiff a written year-end performance review for 2016, which included Solmssen's review and Plaintiff's self-assessment. ¶ 40. Both Solmssen and Plaintiff's reviews indicated that the category, "respected by clients," "fit poorly" as a descriptor for Plaintiff. ¶ 41. Plaintiff also acknowledged that the weakness or impact of the lack of respect was severe. ¶ 41. Solmssen also rated Plaintiff "fits poorly" for "good at building relationships" and "open to new ways of doing things." ¶ 41. And his comments

further stated the LOC was not providing customers with what they want and how they want it. ¶ 41.

At the close of Project Kalahari, Solmssen wanted to make changes to the LOC, including cutting costs and reducing headcount. ¶ 42. In early 2017, Solmssen asked Plaintiff to put together a proposal to revise LOC, including headcount reductions. Instead, Plaintiff delivered materials concerning "LOC service enhancement opportunities." ¶ 43. Solmssen told Plaintiff that that was not what he requested, and despite Plaintiff telling Solmssen that the project should take a week, "[i]t's been longer." ¶ 43.

In April 2017, an AIG employee told Solmssen's chief of staff that Plaintiff was not willing to work with them to reduce LOC expenses. ¶ 44. She stated that her team constantly faced "condescending remarks, arguments about facts that we have had face-to-face meetings to discuss, and constant push back on committed requests and time frames." ¶ 44. In addition, the employee stated that Plaintiff's attitude was "furthest from professional" and was "becoming a hindrance to . . . progressing the review." ¶ 44. Also in April 2017, one of the LOC's internal clients indicated to Solmssen that he was "skeptical that" a proposed plan to reform the LOC "[could] be effectively implemented by current LOC management." ¶ 44.

In May 2017, Plaintiff was terminated. ¶ 45. The AIG employees principally involved in the decision were Annette Berstein, Bozovic, Rose Marie Glazer, Eric Kobrick, Michael Leahy, and Solmssen. ¶ 51. Prior to terminating Plaintiff, Solmssen worked with Human Resources to draft talking points which stated that Plaintiff was being terminated as part of changes AIG was making to the LOC. ¶ 49. Senior leaders at AIG indicated that "this was long overdue" and that the LOC was a disaster under Plaintiff's leadership. ¶ 50. Solmssen stated reasons for terminating Plaintiff included his beliefs that Plaintiff was not willing or able to make the necessary changes to the LOC to make it useful or valuable to AIG; that Plaintiff failed to follow his request to make the LOC leaner and more effective; and that Plaintiff was

10

incapable of doing what the company needed him to do and therefore not the right person to lead the LOC going forward because he did not, would not, or could not make the requested changes. ¶ 45. Solmssen testified that Plaintiff's complaints months earlier played no role in the decision. ¶ 45.

Solmssen invited Plaintiff to return the following Monday to discuss the transition and permitted Plaintiff to take contact information for his professional network. ¶ 46. After he returned on Monday, Plaintiff lost access to AIG systems, including email, telephone, cell, and network access, and that same day, Plaintiff was also told he "needed to leave," a common practice for terminated employees. ¶¶ 46, 47.

Notwithstanding his termination, Plaintiff was eligible to receive LTIP Compensation in May 2017. ¶ 56. AIG repeatedly informed Plaintiff that his 2017 award would be cancelled and not received if he failed to accept the Award Agreements. ¶ 56. Plaintiff understood that if he did not execute the Agreements, he would not receive his LTIP Compensation for 2017, but he did not execute the Award Agreement. ¶ 56.

Pursuant to the terms of both the 2013 and 2017 LTIP, terminated employees were not entitled to any LTIP compensation that had been awarded but not yet vested and paid out prior to termination. ¶ 58. However, both contracts allow a terminated employee to receive said compensation in exchange for a release of claims. ¶ 58. AIG presented Plaintiff with a release, which did not include a provision requiring Plaintiff to affirm he had no knowledge of fraud or other violations committed by AIG, nor did it prevent Plaintiff from making any truthful statements required by law, subpoena, or court order; or in the course of legal, arbitral, or regulatory proceedings; to any government authority, regulatory agency, or self-regulatory organization; or in connection with any investigation by AIG. ¶ 59. Plaintiff refused to sign the release and therefore received no LTIP Compensation that was awarded prior to his termination but was due to be paid after. ¶ 60.

Plaintiff's unpaid LTIP Compensation was reflected in an account managed by third-party administrator UBS, and Plaintiff sent UBS a subpoena to produce documents relating to his UBS account. ¶¶ 61, 62. UBS produced 1,124 pages of documents, none of which included any contract between Plaintiff and UBS. ¶¶ 62, 63.

On October 27, 2017, Plaintiff filed a complaint with the Occupational Safety and Health Administration ("OSHA"), alleging that the concerns he raised to AIG's Compliance Department cost AIG an "opportunity to generate significant revenue and shareholder value." ¶ 68. On February 27, 2020, two days before trial was set to begin before the Administrative Law judge, Plaintiff withdrew his claims and brought this suit on September 3, 2020. ¶ 68. Plaintiff never submitted his OSHA complaint to the Securities and Exchange Commission ("SEC"); however, on September 18, 2020, after initiating this lawsuit, Plaintiff submitted the instant complaint to the SEC. ¶ 64. Finally, in response to interrogatory requests from Defendant, Plaintiff stated that he believed AIG violated federal laws pertaining to fraud, 18 U.S.C. §§ 1348–49, and securities laws, including the Securities Exchange Act § 13(b)(2)(B); Securities Exchange Act Rules 13a-15(a), 13a-15(c), 13a-15(d), and 15d-15(c); and Securities Exchange Act Rule 13(b)(2). ¶¶ 66, 67.

## DISCUSSION

I.   Legal Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must "view the evidence in the light most favorable to the party opposing summary judgment[,] . . . draw all reasonable

inferences in favor of that party, and . . . eschew credibility assessments." *Amnesty Am. V. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). However, the nonmovant may not rely on conclusory allegations or unsubstantiated speculation to defeat the summary judgment motion. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

II.     Analysis

    A.    Federal Claims (SOX, Dodd-Frank)

        1.    SOX Whistleblower Retaliation

SOX afford protections to whistleblowers, prohibiting the retaliatory discharge of employees that report violations of federal laws relating to fraud or federal securities law. On a motion for summary judgment on a SOX whistleblower retaliation claim, the plaintiff bears "the initial burden of making a prima facie showing of retaliatory discrimination." *Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 441 (S.D.N.Y. 2013). In order to do so, an employee must demonstrate that "(1) she engaged in protected activity; (2) the employer knew that she engaged in protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Id.* (quoting *Bechtel v. Administrative Review Bd., United States Dep't of Labor*, 710 F.3d 443, 447 (2d Cir. 2013)). Once a plaintiff establishes these elements, a defendant may "rebut this prima facie case with clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected behavior." *Betchel*, 710 F.3d at 451 (citations omitted). "The defendant's burden under Section 806 is notably more than under other federal employee protection statutes, thereby making summary judgment against plaintiffs in Sarbanes-Oxley retaliation cases a more difficult proposition." *Id.* Summary judgment is appropriate only when, construing all facts in the employee's favor, there is no genuine dispute that the record clearly and convincingly demonstrates that the adverse action would have been taken in the absence of

the protected behavior. I hold that Plaintiff cannot establish a prima facie claim for whistleblower retaliation because the record evidence shows that Plaintiff did not engage in protected activity, and even if he did, AIG had no knowledge of it.

Pursuant to 18 U.S.C. § 1514A(a)(1), a plaintiff's activity is "protected" only if he (1) "provide[s] information," (2) "regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities and commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders," to (3) a federal agency, Congress, or "a person with supervisory authority over the employee." *Leshinsky*, 942 F. Supp. 2d at 441–42.

        a.    Protected Activity

Plaintiff did not engage in protected activity. As an initial matter, as to a purported violation of the federal securities laws, his reporting cannot form the basis for his SOX claim because it occurred five years after his termination. As to his reporting of other fraud-related violations, although Plaintiff reported certain conduct (provided information) to a person with supervisory authority, satisfying the first and third prongs of protected activity, he cannot satisfy the second element because he lacked a reasonable subjective or objective belief that a federal law was violated.

To satisfy the second prong, a plaintiff need not show an actual violation of law or cite a particular statute; however, his belief must be both objectively and subjectively reasonable, and "[t]he reasonableness of a complainant's belief regarding illegality of a respondent's conduct is to be determined on the basis of the knowledge available to a reasonable person in the circumstances with the employee's training and experience." *Mahony v. KeySpan Corp.*, 2007 U.S. Dist. LEXIS 22042, at *14–15 (E.D.N.Y. Mar. 12, 2007) (quoting *Lerbs v. Buca Di Beppo, Inc.*, 2004-SOX-8 at 31 (June 15, 2004).

Plaintiff cannot establish that he subjectively believed that AIG violated a federal law. In 2016, Plaintiff twice submitted certifications attesting that he had no knowledge of violations of either AIG policy, laws, or regulations, including federal laws pertaining to mail fraud, wire fraud, bank fraud, and securities fraud; or knowledge of instances portending a corruption risk, including conflicts of interest, bribery, illegal gratuities, or economic extortion. On November 28, 2016, Plaintiff completed his certification as to AIG's 2016 Code of Conduct and stated that he had no knowledge of any policy or legal violations. Similarly, on December 1, 2016, he certified that he had no "knowledge of any fraud perpetrated or alleged or suspected that could result in a material misstatement of AIG's financial statements," or "of any fraud at AIG, perpetrated, alleged or suspected, regardless of materiality."

In his deposition, Plaintiff also confirmed that he did not have a subjective belief that any policy or law had been violated. He testified that he always sought to be truthful and candid in completing the requested certifications, and that he did so in good faith based on his best knowledge and genuine beliefs at the time. Katzel Depo. 12:22–13:16. Although Plaintiff has since responded to interrogatories stating that he believed the mail and wire fraud statutes were violated, this does not create a genuine issue of fact as to his subjective belief. Having admitted that his certifications were made in good faith and on genuine belief, he cannot, by later statement, retroactively establish a subjective belief.

Even assuming that Plaintiff believed that AIG was engaged in fraudulent conduct, within the meaning of SOX, based on his education and experience, such a belief would not have been objectively believable. For example, with respect to his concerns about AIG's failure to maximize shareholder value, these do not support an objective belief that AIG committed fraud or any other enumerated SOX violation. Plaintiff testified that his concerns were with serious gaps in the process by which AIG pursued strategic transactions that "could not be assured that those transactions were being pursued in a way that maximize[d] the value to

15

the company" or "would lead AIG to be able to extract the best possible value out of the asset for the company and its shareholders." Nowhere did he claim that AIG *had* defrauded shareholders or intended to deceive clients or shareholders. His reports of failure to maximize shareholder value fail as a matter of law. *See Kantin v. Metropolitan Life Ins. Co.*, 696 Fed. App'x 527, 529 (2d Cir. 2017) (rejecting whistleblower claim where the plaintiff did not allege the company "defrauded shareholders or intended to deceive clients based on" the reported conduct).

Similarly, Plaintiff's concerns about failures or insufficiencies of internal AIG policies related to conflicts of interest or document preservation also cannot support a SOX claim. Plaintiff never once stated that these concerns were about any alleged misrepresentations to shareholders, and they are otherwise untethered from enumerated SOX violations.

b. AIG's Knowledge of Plaintiff's Protected Activity

Even if Plaintiff could establish that he engaged in protected activity, his claim would still fail because the record evidence does not show that AIG knew of such activity. When Plaintiff certified in 2016 that he had no knowledge of any violations of policy or law or conduct posing a corruption risk, AIG could reasonably rely on those certifications. Although Plaintiff reported his concerns, all of Plaintiff's supervisors testified that they did not perceive Plaintiff as expressing any belief that AIG employees were committing fraud or violating the rules or regulations of the SEC. To wit, Solmssen averred that if there were intimations of fraud, that would have sparked his interest. Because Plaintiff certified that no violations had occurred, and his supervisors had no belief that he was reporting such violations, AIG cannot be said to have had knowledge that Plaintiff engaged in protected activity. His later termination, for unrelated reasons, including his inability or unwillingness to carry out Solmssen's requests, was not related to any protected activity.

In sum, because Plaintiff fails to establish that he engaged in protected activity or that AIG had knowledge of the same, Defendant is entitled to summary judgment as a matter of law on Plaintiff's SOX whistleblower claim.

2. SOX and DFA Retaliatory Termination Claim

To sustain a SOX and DFA antiretaliation claim, "an employee must prove by a preponderance of the evidence that (1) [he] engaged in protected activity; (2) the employer knew that [he] engaged in the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Murray v. UBS Sec., LLC*, 43 F.4th 254, 2022 U.S. App. LEXIS 21699, at *11 (2d Cir. Aug. 5, 2022). And "to prevail on the 'contributing factor' element, a whistleblower-employee must prove that the employer took the adverse employment action against the whistleblower-employee with retaliatory intent—*i.e.*, an intent to discriminate against an employee . . . because of' lawful whistleblowing activity." *Id.* at *12.

Plaintiff cannot establish a prima facie claim for retaliatory termination because he cannot show that he was terminated with retaliatory or discriminatory intent. As discussed above, none of Plaintiff's superiors understood him to be engaging in whistleblowing when he raised his concerns. Defendant could not have terminated him because of such activity and is therefore entitled to summary judgment as a matter of law on Plaintiff's SOX and DFA antiretaliation claim.

B. State-Law Claims

Having granted Defendant's motion as to Plaintiff's federal claims for whistleblower retaliation and retaliatory termination, I decline to exercise supplemental jurisdiction over his state-law claims. *See* 28 U.S.C. § 1367(c)(3); *Klein & Co. Futures v. Bd. of Trade*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where . . . federal claims are

eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

## CONCLUSION

For the reasons provided above, Defendant's motion for summary judgment is granted. The Clerk of Court shall terminate the motion (ECF No. 82), enter judgment in favor of Defendant with costs, and mark the case closed.

SO ORDERED.

Dated:   September 23, 2022                 /s/ Alvin K. Hellerstein
         New York, New York            ALVIN K. HELLERSTEIN
                                       United States District Judge